WALTER SCHANEMAN AND JOHN SCHANEMAN,
CONSERVATORS OF THE ESTATE OF CONRAD SCHANEMAN,
SR., FOR AND ON BEHALF OF CONRAD SCHANEMAN, SR.,
AND CONRAD SCHANEMAN, SR., APPELLEES, V.
LAURENCE SCHANEMAN, APPELLANT.

291 N. W. 2d 412

Filed April 23, 1980.   No. 42587.

Wright & Simmons and John A. Selzer, for appellant.

John K. Sorensen, for appellees.

Heard before KRIVOSHA, C. J., BRODKEY, and HASTINGS, JJ., and FAHRNBRUCH and CLARK, District Judges.

CLARK, District Judge.

This is an action in equity to set aside and cancel a deed executed by Conrad Schaneman, Sr., hereinafter called Conrad, in favor of his eldest son, the defendant, Laurence Schaneman. The action was initiated by the conservators of Conrad's estate and by Conrad himself. Conrad died shortly before trial and the action was revived in the name of the special administrator of Conrad's estate.

By his answer, the defendant admitted the execution of the deed but alleged that the conveyance was pursuant to an oral understanding and agreement between Conrad and the defendant.

The District Court for Scotts Bluff County, Nebraska, found that the execution of the deed was a result of fraud and undue influence, set aside the deed, and quieted title in Conrad. Defendant appeals.

A fair summary of defendant's assignments of error is that the findings of the trial court are contrary to the evidence.

This matter on appeal is reviewed de novo on the record. We affirm the judgment of the District Court.

The property in question was purchased in January 1945 for a price of $23,500. Defendant helped arrange the purchase and loaned his father $10,500 toward the purchase price. The grantees were Conrad and the defendant as joint tenants. There is some testimony that another son, Conrad, Jr., loaned his father $2,500 toward the purchase price also. In any event, it is agreed that Conrad was the real purchaser. By October 1946, Conrad had repaid the loans to his sons and the defendant quitclaimed his interest in the farm to Conrad.

Conrad, who was born in Russia, could not read or

write the English language.  He was the father of
eight sons and five daughters, all of whom survived
him.   All the sons except one are farmers in the
Scottsbluff area.   Conrad had originally owned four
80-acre farms but had sold one of them prior to 1975.
He retired from farming in about 1955.   After Con-
rad's retirement various of his sons farmed his four
80-acre farms on a crop rental basis.

Over the years, the family had been close-knit,
especially the father and the sons.  It had been cus-
tomary for Conrad and his sons to help one another
financially in the purchase of farms.   Conrad helped
his sons; the sons helped Conrad; and the brothers
helped one another in this fashion.

After Conrad's retirement from farming, all the
children had frequent contact with Conrad and
helped him with his personal needs, although de-
fendant, as the oldest son, perhaps had more contact
and a closer relationship with Conrad.

At some time between approximately 1973 and
mid-1974, the defendant and Conrad had a falling out
and were not speaking with one another and defend-
ant no longer came by to see his father.   In mid-
1974, the defendant and Conrad apparently resolved
their problems and defendant resumed a normal re-
lationship with his father.

Prior to the fall of 1974, and for some 15 or 20
years, the youngest son, Floyd, had primarily been
the one to assist his father in the more technical
aspects of his business affairs, such as tax matters.
Since 1967, a daughter-in-law, Eylene Schaneman,
had made daily visits to Conrad to administer
needed shots of insulin, which in 1974 increased to
two shots daily.

In the fall of 1974, the defendant, who had by then
made up his differences with his father, advised the
other children that he would henceforth manage his
father's business matters and that they no longer
need be concerned in that regard.   At about the

same time, the defendant notified Eylene Schaneman that she had been giving the insulin shots to Conrad long enough and that other arrangements would be made. Thereafter, the defendant was the primary person who advised Conrad and handled Conrad's business matters, although the other sons did continue to help Conrad to some extent.

On March 18, 1975, Conrad deeded the farm in question to the defendant for a stated consideration of $23,500, which was the original purchase price of the property in 1945. The value of the farm in March 1975 was between $145,000 and $160,000.

In March of 1975, Conrad was a man 82 years of age whose health had been deteriorating since at least 1971. He had numerous periods of hospitalization and suffered from heart problems, diabetes with extremely high' and uncontrollable blood sugar levels at times, and obesity. He weighed between 325 and 350 pounds, had difficulty breathing, could not walk more than 15 feet, and was no longer able to drive an automobile. He was unable to shave himself and a special jackhoist had to be utilized to get him in and out of the bathtub. He was, for all intents and purposes, an invalid, completely dependent on others for most of his personal needs and for transportation, banking, and other business matters.

Conrad's children, other than the defendant, testified that during early 1975 Conrad had some days when he was sharper and more alert mentally than on other days, that at times he was confused, had difficulty communicating and, on occasion, seemed to lapse into times long past. On at least one occasion in 1974, he had difficulty placing Eylene when she was there to administer Conrad's insulin medication.

In about the spring of 1977, one of Conrad's sons discovered by accident that defendant's name was on Conrad's bank account as a joint tenant with right of survivorship. At about the same time, it

was discovered that defendant had bought, with Conrad's money, a $20,000 certificate of deposit and that this also listed defendant as joint owner with right of survivorship. It was also later discovered that Conrad had executed a power of attorney in favor of defendant on August 20, 1975.

Proceedings were instituted in the county court of Scotts Bluff County and, in August 1977, Conrad's sons Walter and John were appointed as conservators of Conrad's estate. This action followed.

In September 1978, at hearings regarding the petition for appointment of a conservator, the defendant testified that he visited Conrad at least once a day, sometimes more often. He stated that he had been taking care of Conrad's business for over 2 years. Defendant further testified that in late 1974 and early 1975 Conrad had offered to give a farm to defendant several times, but that he had refused to accept it. Finally, according to the defendant, Conrad told the defendant to take his pick of the three farms. Defendant acceded to his father's wishes and picked the farm in question. Defendant testified that his father then told him he had made a mistake, that he should have picked the "Home Place" instead, but that defendant persisted in his choice. Defendant stated that he offered to give his father money but that Conrad refused. Defendant gave his father a check for $23,500 but Conrad didn't cash it immediately. It is noted that, at these hearings, the defendant never claimed any prior oral agreement between the defendant and Conrad for purchase of any farm and, in particular, none for the purchase of the farm in question.

At the conservatorship proceedings, the defendant stated that a life estate had been reserved for Conrad and that the reservation was set out in the deed. When shown that the deed contained no such provision, he said that it must have been an oral agreement between him and Conrad.

Regarding the purchase of the $20,000 certificate of deposit, defendant admitted that he had been confronted with the fact that his name was listed as a coowner; that he had denied same; and that, when he found that the brothers were correct, he had immediately taken steps to have his name removed. First he stated that his name had been placed on the CD at the direction of the bank, but then decided that it was just an error.

Defendant further denied that he had ever tried to buy the farm from Conrad before March 1975 and that the only conversations with Conrad regarding that property were regarding Conrad's desire to make a gift to the defendant.

By deposition in December 1977, a transcript of which was received in evidence, the defendant stated that he and Conrad had a very close relationship and that his father trusted and relied on the defendant in March of 1975. He again denied that he had tried to buy the farm from Conrad for $23,500 roughly 4 months prior to March 1975 or at any other time. He stated that Conrad wanted defendant to have the farm as a gift due to the fact that defendant had helped Conrad buy the farm in 1945. He further stated that his father had told him, shortly before 1975, that he was going to give the farm to him.

Regarding a conversation that defendant claimed he had with Conrad at the time of the farm purchase in 1945, defendant testified, "[W]e kind of talked about sometime if he'd get to where he couldn't use it, maybe I could take it from there."

He stated that the father made him a gift of the farm but that they exchanged checks in the amount of $23,500 each "to show some consideration [for] the farm."

In April 1978, the defendant testified in a proceeding in county court that he actually bought the farm for $23,500; that his father didn't want the money; and that, at his father's suggestion, the exchange of

checks was made in 1976 because Conrad wanted the matter cleared up.

At trial, defendant testified that in March 1975 his father trusted and relied on the defendant; that defendant held a "special place" with his father; and that Conrad had complete trust and confidence in defendant. He did not recall any period that he and Conrad were not speaking and said that he and his father had never had a falling out. He further stated that, in March 1975, he was handling Conrad's business affairs generally.

At trial, defendant further testified that in 1945, when he had loaned his father money toward the purchase price of the farm, he had asked his father if he, the defendant, could buy the farm back from Conrad for the original purchase price when Conrad was through using the farm. According to defendant, Conrad agreed to do this. Defendant stated that no one but he and Conrad knew of this oral agreement.

Defendant admitted that some time after the property had been conveyed to him, his brother Leroy, who was the tenant farmer on the property in question, approached defendant regarding some $1,500 worth of improvements to be made on the farm. The improvements were made and were paid for out of Conrad's money. Defendant did not tell Leroy that he was then title owner of the farm. Defendant admitted that these improvements would have benefited him as owner of the farm.

Defendant admitted that he had not mentioned the alleged 1945 oral agreement with Conrad when he testified at the conservatorship hearings and in his deposition of December 1977, but stated that that was because the agreement did not come to mind at that time.

Defendant testified that although his father was physically very ill in 1975, he was mentally alert and had full knowledge of his actions. In response to a

question as to why, in April 1975, he had felt it necessary to ask one of Conrad's doctors to express an opinion as to Conrad's mental condition, defendant stated that he was not necessarily concerned about the deed of March of 1975.

Although Conrad died before trial, his testimony from the conservatorship proceedings and from three depositions was admitted into evidence.

Conrad testified that Floyd used to take care of his business, and that when defendant took it over, Conrad wanted to have Floyd continue to help, but defendant said no. Conrad stated that 2 or 2½ years earlier (1974-75), the defendant had approached him and attempted to purchase the farm for the original purchase price; that Conrad had refused; that it made him mad, because defendant "didn't want to give nothing." Conrad had no recollection of a check being tendered by the defendant for $23,500 at the time of the execution of the deed but he knew he wouldn't sell the farm for that because he had paid that for it and it was worth much more now.

Conrad specifically denied any oral agreement ever having been made between him and the defendant regarding sale of the farm at the original purchase price. He further denied ever telling the defendant he would either sell or give the farm to the defendant because the defendant helped to buy the farm.

Conrad testified that within a few months after he had refused to sell defendant the farm, he decided to make a gift of the farm because defendant was his best boy and looked after him. He stated defendant only asked to buy the farm on one occasion, but asked for it as a gift several times; that no one else was around when defendant asked Conrad to give him the farm: "He was pretty careful about that." Conrad could not refuse defendant anything because defendant was his best boy. Defendant, according to Conrad, told him not to tell the other children

about the gift; to "keep it quiet."

Conrad testified that although he was originally happy with the fact that he had made a gift of the farm, he had changed his mind when he thought about it, because it was not right that defendant had his own farms but wanted to take this farm away from the other kids. He also stated he had changed his mind because the other kids were unhappy and had "raised hell" about it. Conrad further stated that it was his desire that his children share equally in his property when he could no longer use it.

In response to questions as to whether defendant ever talked Conrad into doing anything he didn't want to do, Conrad stated that defendant was smart about that; "he kept the other boys apart." When asked if he had ever done anything because the defendant wanted him to, Conrad responded that the defendant dictated everything and told him what to do. When asked if property was important to him at the time he gave the farm to the defendant, Conrad replied that it wasn't; that nothing was important; that he didn't care anymore.

Conrad's sons, other than defendant, testified at trial regarding the physical disabilities of their father and the fact that they saw Conrad frequently and that his mental acuity seemed to decrease from time to time. They all testified that the defendant had never mentioned any oral agreement to buy the farm nor the fact that the farm had been deeded to him. They testified that Conrad had always trusted the defendant the most of any of the children, although all the children maintained a close and friendly relationship with their father. Son Leroy also testified that in 1974 he had offered his father $150,000 for the purchase of the farm and had been refused. The children further testified that Conrad's mental acuity seemed to be much the same in his later years as it was in 1975.

Conrad's second wife, Mollie, age 80, who had

signed an antenuptial agreement and had no interest in the property, except a one-half interest in the house located on the farm, testified by deposition.

She testified that Conrad, in 1975, was physically unable to do anything by himself. She also testified that Conrad and all of his boys were "awful close" but that defendant was the favorite son and that defendant helped Conrad in his business and Conrad trusted defendant with all his affairs.

Mollie further testified that there was a time when defendant and Conrad had some trouble and were not speaking to each other but that it didn't last too long. She stated that Conrad was upset because defendant would not talk to him and that during this period defendant didn't do anything for Conrad. Later she saw the defendant and Conrad after they had been "bawling" or crying together and that then things were all right and "they was hand in hand."

She testified that Conrad told her he had promised the farm to defendant and she went with Conrad to the lawyer's office to sign the deed. Defendant hired the lawyer; the defendant's daughter worked for the lawyer; and the defendant and Mollie were the only ones to go to the lawyer's office with Conrad.

She further stated that the only time Conrad talked of making a gift of the farm to the defendant, the defendant was present. She testified that the lawyer read the deed to her and to Conrad at the same time. She further testified that, in her opinion, Conrad's mind was absolutely sound at the time the deed was signed.

At trial, the lawyer who prepared the deed and witnessed the execution of same testified that he had first met Conrad when the defendant brought Conrad to his office on March 17, 1975. Conrad and the defendant told the attorney that Conrad wanted to convey or make a gift to the defendant of the farm and that a life estate for Conrad was discussed. The at-

torney prepared a deed reserving a life estate to Conrad.

On March 18, 1975, Conrad and the defendant returned and stated they had been discussing the matter and had decided to do what had originally been agreed upon in prior years; that is, that the defendant was to buy the farm for the original purchase price. The attorney then drafted a deed without reservation of a life estate. Conrad told the attorney that the defendant had helped him buy the farm and that he (Conrad) had told the defendant that when Conrad was done with it defendant could have it for what had been the original purchase price. Conrad, at the same time, told the attorney that the others would cause trouble for the defendant and asked him to draft a will which would cut off any of the children who contested the conveyance. This was done. Conrad executed the deed and will in the presence of the attorney after having both of the instruments read to him. The attorney expressed the opinion that Conrad was completely competent on March 17 and 18, 1975. The attorney had been hired by the defendant and was later hired by the defendant to represent him and Conrad in the conservatorship matter.

Another lawyer, in the same firm, testified that on March 18, 1975, he had visited with Conrad for 15 or 20 minutes. Conrad told him he wanted defendant to have the farm. This witness felt Conrad had testamentary capacity and was mentally competent on that date.

H. B. Kennison, a medical doctor, testified by deposition that he had been Conrad's treating physician during Conrad's hospitalization in Denver, Colorado, on six occasions between January 1971 and May 1975. The last time the witness had contact with Conrad was during his hospitalization of April 25 through May 4, 1975. The witness testified that Conrad, during the years 1971-75, was a very sick old

man, suffering from diabetes, shortness of breath, heart problems, and obesity. He was virtually an invalid in December 1974 and had a blood-sugar level of 440 on admission to the hospital at that time. Normal blood-sugar level was stated to be 70 to 110.

Dr. Kennison stated that if the mental sharpness of Conrad changed from time to time, this could be explained by the fact that the diabetes was out of control and that a high blood-sugar level can affect a person's mental sharpness. Hospital records reflected that in April 1975, Conrad was generally considered to be well-oriented "in all three spheres," in that he seemed to know who he was, where he was, and when it was. The records did reflect at least one occasion of mental aberration when Conrad complained that he didn't know who the nurses were, where he was, or how he got there. The doctor felt, however, that on the occasions that he observed Conrad, Conrad was competent and able to know what was going on in regard to his business affairs.

Regarding this last period of hospitalization in Denver, Conrad testified in one of his depositions that while he was in the hospital, defendant was in his room wanting him to sign things, that he did not recognize defendant, and he had to ask the nurse who defendant was.

Dr. Clark D. Wieland, a psychiatrist, testified that he had examined Conrad in July 1977. He had the opinion that, at that time, Conrad's testamentary capacity was intact but that he would not be capable of intricate management of his business affairs. He found Conrad to be hazy in orientation in terms of time; that his recent memory was impaired; that he was more prone to mood swings than most people would be; and that his comprehension was "down."

Dr. Wieland felt that Conrad had moderate organic brain syndrome at the time of the examination which, together with Conrad's age, diabetes, and

other medical problems, would tend to make him emotionally unstable and to impair his judgment. He further felt that a high blood-sugar level could cause Conrad's judgment, emotional stability, and general mental alertness to vary from one period to another, that he could have what the doctor termed "rainy, cloudy, or clear" days. He felt that the difference between a "cloudy" or "clear" mental condition would not be apparent to most people. The doctor stated that Conrad's condition would have been a lot worse in July 1977 than it was in March 1975.

Dr. Wieland stated in a deposition that Conrad advised him that he, Conrad, had willed one-third of his property to the defendant because the defendant had helped him a great deal in acquiring his estate and Conrad felt he owed a special obligation to that son. Conrad expressed no regret over deeding the property to defendant. Dr. Wieland stated that it was probable that Conrad had some mental impairment in 1975 but that it was probably worse in 1977.

The claim made in defendant's answer that the deed was executed pursuant to an oral contract entered into between him and his father in 1945, does not hold up under scrutiny. Defendant's testimony, given at various times, regarding the alleged oral contract, is vague, evasive, and contradictory. We conclude that there was no such contract and proceed to review the evidence as it relates to whether or not the gift was a result of undue influence on the part of the defendant.

An examination of the evidence reflects, in our opinion, that from the fall of 1974 until the conservatorship proceedings were commenced, there existed between the defendant and Conrad a confidential relationship and that, during that period, Conrad relied on the defendant for advice in his business affairs.

"[A confidential] relation exists between two per-

sons if one has gained the confidence of the other and purports to act or advise with the other's interest in mind." *Boettcher v. Goethe,* 165 Neb. 363, 378, 85 N.W.2d 884, 892 (1957).

"In a confidential or fiduciary relationship in which confidence is rightfully reposed on one side and a resulting superiority and opportunity for influence is thereby created on the other, equity will scrutinize the transaction critically, especially where age, infirmity, and instability are involved, to see that no injustice has occurred." *Cunningham v. Quinlan,* 178 Neb. 687, 134 N.W.2d 822 (1965) (court's syllabus).

Here the evidence reflects that, due to age and physical infirmities, Conrad was, for all intents and purposes, an invalid at the time of the conveyance. It further supports a finding that Conrad's mental acuity was impaired at times and that he sometimes suffered from disorientation and lapse of memory. Considering all the evidence, we find that, in March 1975, Conrad was subject to the influence of the defendant, who was acting in a confidential relationship; that the opportunity to exercise undue influence existed; that there was a disposition on the part of the defendant to exercise such undue influence; and that the conveyance appears to be the effect of such influence. These findings establish a prima facie case of undue influence and cast upon the defendant the burden of going forward with the evidence.

A prima facie case of undue influence is made out in case of a deed where it is shown by clear and satisfactory evidence (1) that the grantor was subject to such influence; (2) that the opportunity to exercise it existed; (3) that there was a disposition to exercise it; and (4) that the result appears to be the effect of such influence. . . . In an action based on undue influence, when a confiden-

tial relationship exists between the parties, and a prima facie case is established, the burden of proof remains on the plaintiff, but the burden of going forward with the evidence shifts to the defendants.

*Anderson v. Claussen,* 200 Neb. 74, 79, 262 N.W.2d 438, 441 (1978). See, also, *Guill v. Wolpert,* 191 Neb. 805, 218 N.W.2d 224 (1974).

The two attorneys who were present at the execution of the deed testified regarding the testamentary capacity of Conrad at the time in question. However, their exposure to Conrad was limited and the issue is not merely one of testamentary capacity and mental competence on a given day, but that of undue influence and the mental acuity of Conrad as it pertains to Conrad's susceptibility to that undue influence. Medical testimony was received to the effect that Conrad's lack of sharpness might well not be noticed by one who had only limited exposure to him.

Further, it is apparent that Conrad was not afforded the opportunity to seek independent advice from any source other than defendant. "One of the most important elements considered by the courts in determining whether a presumption of undue influence has been rebutted is whether the grantor has received independent advice . . . ." *Gaeth v. Newman,* 188 Neb. 756, 763, 199 N.W.2d 396, 402 (1972). See, also, *Rule v. Roth,* 199 Neb. 746, 261 N.W.2d 370 (1978).

We find that the defendant has not rebutted the presumption of undue influence which was raised by the plaintiff's prima facie case.

Further, inasmuch as there was irreconcilable conflict in some of the testimony, we consider that the trial court observed the witnesses and obviously accepted one version of the facts over the other. See *Von Seggern v. Von Seggern,* 196 Neb. 545, 244 N.W.2d 166 (1976). Even from the cold record, it is

obvious that the defendant was not a very credible witness. As defense counsel stated in his appellate brief, "He was not a good witness for himself."

The judgment of the trial court was correct and is affirmed.

AFFIRMED.