ED BLOOMFIELD, APPELLANT, V. NEBRASKA STATE BANK, APPELLEE.

465 N.W.2d 144

Filed January 25, 1991.    No. 88-757.

Robert R. Gibson, of Professional Legal Associates of Nebraska, P.C., for appellant.

Daniel L. Hartnett, of Crary, Huff, Clem, Raby & Inkster, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

HASTINGS, C.J.

Plaintiff, Ed Bloomfield, has appealed from an order dismissing his petition at the close of plaintiff's case. We affirm.

The petition alleged two causes of action against the defendant, Nebraska State Bank (NSB), arising out of financial relations between Bloomfield and the bank—one claiming a breach of contract by the bank to renew Bloomfield's operating line of credit, and one claiming breach of the bank's fiduciary duties in terminating Bloomfield's operating credit, accelerating Bloomfield's operating loan, and compelling Bloomfield to sell his livestock and other income-producing assets in a commercially unreasonable manner.

Bloomfield has farmed since 1971 and has land in Dixon and Dakota Counties. He began banking with NSB in January 1982, and according to NSB's loan file notes, Bloomfield had promissory notes renewed on May 10, 1982, January 24, 1984, and December 24, 1984. The note renewal of December 24 concerned the note which is one of the subjects of this lawsuit.

In January 1985, Bloomfield had three outstanding loans with NSB. The first note was due on February 1, 1985, in the

amount of $115,000. The second note was due on November 14, 1985, in the amount of $43,500. The remaining note was due on January 15, 1986, in the amount of $30,000. The security for these notes was Bloomfield's farm products, livestock, and equipment.

Bloomfield testified that on January 29, 1985, a loan officer for the bank stated that Bloomfield had been a good customer and that there would be no problem in extending him credit. However, the loan officer did not promise to extend Bloomfield's loan or issue new loans. There was testimony that NSB's records indicate that Bloomfield's loan rating had dropped to a six. A six rating indicates that the loan repayment is classified as doubtful or a possible loss. This low rating was a substantial drop from Bloomfield's previous high ratings in 1984. Additionally, NSB sent Bloomfield a letter to arrange for a farm visit to verify collateral, in response to which Bloomfield was uncooperative.

Bloomfield testified that he had signed several notes with NSB during the time he did business with the bank and that there were a lot of them that did not get paid when due. He would get the notes extended, usually for a term of 6 months. In order to obtain additional financing he would make out financial statements for the bank. This would be approximately an annual event. Bloomfield had signed notes for NSB of $30,000, due January 15, 1986; for $43,500, due November 14, 1985; and for $115,000, due December 1, 1984.

Bloomfield testified that on December 14, 1984, he paid the interest on the $115,000 note, which was then overdue, so the bank extended the due date to February 1, 1985. On January 29, 1985, Bloomfield signed a new security agreement, for the reason, as he put it, "We did that about every year." It was at that time, Bloomfield claimed, that Jeffrey Gebauer, representing the bank, told him that he, Bloomfield, had always been a good customer and that there would be no problem extending credit for another year.

However, Bloomfield received a letter from Gebauer dated January 31, 1985, which in effect told Bloomfield that due to the deterioration in his current financial position, it was necessary for the bank to make a visit to the farm operations to

observe livestock on hand and take an inventory of equipment. The letter asked that Bloomfield cooperate in contacting the bank to arrange a date for the visit. Bloomfield testified that although it did not make any difference to him whether the bank wanted to make a visit, still, it made him mad, and he just was not going to go with the bank representative.

Bloomfield testified that it was his intention to pay the operating note that came due on February 1, 1985, but that there would have been a little carryover. He told the bank that the carryover would amount to probably $50,000. He also said that he expected to borrow some more money on top of that.

In February 1985, Bloomfield learned that the bank was calling his loan. He thought that he had been told by Gebauer of this fact, but in any event he did receive a letter dated February 22, 1985, signed by Gebauer, which advised that the bank had assigned Bloomfield's certificates of deposit and savings account, totaling $59,319.16, to his existing debt. The amount of $2,381.32 was applied to Bloomfield's overdrawn checking account, and $2,528.44 was applied to the accrued interest on the $115,000 note and $54,409.40 to the principal, leaving a balance remaining and due of $49,590.60 on that particular note as of February 22, 1985. Bloomfield said that he also got information from talking to Gebauer that the bank was not going to renew his note. As a matter of fact, the bank filed a replevin action against Bloomfield, seeking to obtain his equipment, cattle, and grain to pay off the indebtedness. However, Bloomfield arranged for a private sale, the proceeds of which were used to pay off the bank in its replevin action except for approximately $10,000 of a note that was not due until January 15, 1986, which the bank consented to "leave in place" until that date.

Bloomfield then testified as to some land that he claimed he had to sell, apparently because NSB would not loan him operating capital, and also as to crops he could not raise for the same reason. He said that he went to several other banks seeking financing, but was unable to obtain any credit.

Bloomfield attempted to prove loss of profits by testifying in rather vague terms as to production he obtained from certain farms in 1986. This was in support of his claim for damages.

On cross-examination Bloomfield admitted that Gebauer, of NSB, made no promise to him about extending credit for 1985 and beyond, and there was no discussion between the two of them about the amount of money the bank might loan Bloomfield, what the interest rate would be, the size of any possible loan, the nature or amount of collateral that would be required to be pledged, or the term of any such possible loan.

Bloomfield offered the deposition testimony of Gebauer. Gebauer testified that on February 19, 1985, he received a call from Lincoln Grain indicating that Bloomfield had requested that Lincoln Grain issue a check in the name of Bloomfield's nephew, Aaron Nelson, which represented the proceeds from the sale of some of Bloomfield's grain. Gebauer said that he became concerned because NSB had an all-inclusive security agreement filed on Bloomfield's property.

Although Bloomfield had testified that the check from Lincoln Grain was for grain that his nephew had earned as part of an agreement with Bloomfield for helping him farm, there was pretrial deposition testimony by Bloomfield that he had never told the bank about giving Nelson 100 acres of corn for his labor.

Bloomfield then offered the testimony of Roy Yaley, president of NSB. He testified that the bank became concerned when it found out about the check from Lincoln Grain because this would mean that Bloomfield was selling grain out of trust; i.e., the bank had a lien on all of Bloomfield's property, this particular grain was deposited with Lincoln Grain as Bloomfield's property, and the proceeds from the sale of that property were going to someone else. Yaley went on to testify that the bank had reviewed Bloomfield's line of credit periodically and the bank knew that there had been a problem getting an inspection of Bloomfield's property. According to Yaley, the decision to call Bloomfield's loan was made on February 20, 1985. As Yaley testified: "Here we got a loan past due, we got a loan that we can't make an inspection on, and we have got a loan where the customer is trying to sell mortgage property out of trust. We don't have any other choice."

Also introduced into evidence by Bloomfield were the bank's comments in the loan file, a journal-like document that shows

every transaction which occurred and memos made reflecting activity in the loan file. An entry dated January 24, 1985, discloses checks of Bloomfield's making payments on notes to the Federal Land Bank and Norwest Bank. Bloomfield's debts of $30,495.75 to the Federal Land Bank and $9,754 to Norwest Bank, previously unknown to NSB, were thereby discovered.

In reviewing the evidence on a motion to dismiss,

> the party against whom the motion is made is entitled to have every controverted fact resolved in his or her favor and to have the benefit of every inference which can be reasonably drawn from the evidence; if there is any evidence in favor of the party against whom the motion is made, the case may not be decided as a matter of law.

*Tiede v. Loup Power Dist.*, 226 Neb. 295, 299, 411 N.W.2d 312, 316 (1987). In sustaining a motion to dismiss, the trial court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion. *Tiede v. Loup Power Dist., supra.*

The express terms of the note for $115,000 which was called provided that "[i]f the note is not paid when due or if holder believes itself insecure, the entire note will become due and collectible at once . . . ." There was no question but that the note was overdue and in default, and the bank was entitled to call it.

The only questions with which we must deal are whether, as alleged in plaintiff's petition, the bank breached a contract arising from a course of dealing with Bloomfield of providing Bloomfield with operating capital from year to year as he needed it and whether the bank breached a fiduciary duty which, it was alleged, existed between Bloomfield and the bank to give Bloomfield adequate notice of its intention of terminating his credit.

> The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade.

Neb. U.C.C. § 1-205(4) (Reissue 1980). We have previously referred to the express terms of the contract which gave the

bank the right to call the loan when Bloomfield was in default of payment. By not meeting his obligation on the due date of February 1, 1985, Bloomfield had defaulted on his loan.

Bloomfield argues that the course of dealing between the parties made it reasonable for him to expect that the past-due promissory note would be renewed if he could not make payment in full at the time of maturity. A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct. § 1-205(1).

This amounts to a claim that there was an implied contract between Bloomfield and NSB to continue to renew notes without payment so long as Bloomfield desired credit. However, to have an implied contract there must be evidence of mutual intent; without such evidence there cannot be an implied contract. *Alward v. United Mineral Products Co.*, 197 Neb. 658, 250 N.W.2d 623 (1977).

Bloomfield began banking with NSB in January 1982, and according to NSB's loan file notes, Bloomfield had promissory notes renewed on May 10, 1982, January 24, 1984, and December 24, 1984. The note renewal of December 24, 1984, however, concerned the note at issue, and thus there were only two previous note renewals while Bloomfield banked with NSB. Two note renewals over a 3-year period of doing business can hardly establish a course of dealing to automatically renew mature promissory notes without payment. A promise or mutual intent to indefinitely renew Bloomfield's promissory notes cannot be inferred from the parties' course of conduct in this instance.

Bloomfield maintains that NSB's decision not to renew his line of credit and to accelerate his notes was a breach of a covenant of good faith. Neb. U.C.C. § 1-203 (Reissue 1980) states that every contract within the code encompasses an obligation of good faith in its performance or enforcement. The good faith obligation can exist in a debtor-creditor relationship. See *Yankton Prod. Credit Assn. v. Larsen*, 219 Neb. 610, 365 N.W.2d 430 (1985).

However, *Yankton Prod. Credit Assn.* is distinguishable

from the case at bar in the first instance because it was decided on a motion for summary judgment; whereas here, the plaintiff was permitted to introduce all his evidence. In *Yankton Prod. Credit Assn.* there was evidence introduced in the summary judgment proceedings that the lending agency approved a request for a loan of $821,982.37, a note was signed, and thereafter the lending institution "refused to loan the Larsens the remainder of the previously committed $570,000 for livestock inventory." *Id.* at 613, 365 N.W.2d at 432.

In the present case there was no evidence from which it could be inferred that there was a continuing agreement to furnish Bloomfield money regardless of the circumstances. The most that Bloomfield would say was that the bank told him his chances for a loan did not look too bad. As set forth above, Bloomfield testified that there was never any promise on the part of the bank to extend his credit, no discussion as to any amount that might be loaned, and no discussion as to interest rate or term of a loan. There simply is no credible evidence from which it could be inferred that there was an implied contract to continue Bloomfield's line of credit based on previous dealings.

Bloomfield cites three cases from other jurisdictions on the issue of a good faith obligation on the part of NSB: *State Nat. Bank v. Farah Mfg. Co.*, 678 S.W.2d 661 (Tex. App. 1984); *Pecos Const. Co. v. Mortgage Invest. Co. of El Paso*, 80 N.M. 680, 459 P.2d 842 (1969); and *K.M.C. Co., Inc. v. Irving Trust Co.*, 757 F.2d 752 (6th Cir. 1985). Those cases are all factually different from the case at bar. In each of those cases there was an existing written and signed contract extending loans or promising money to debtors. Here, there is no such contract. Additionally, in *State Nat. Bank* the debtor was not in default at the time the creditor accelerated the loan repayment and the creditor was attempting to run the company.

Bloomfield asserts that NSB breached its fiduciary duty. "[A confidential] relationship exists between two persons if one has gained the confidence of the other and purports to act or advise with the other's interest in mind." *Boettcher v. Goethe*, 165 Neb. 363, 378, 85 N.W.2d 884, 892 (1957). Accord *Schaneman v. Schaneman*, 206 Neb. 113, 291 N.W.2d 412 (1980). Bloomfield contends that NSB has a fiduciary duty

(confidential relationship) because NSB was in complete control of Bloomfield's financing ability. NSB maintained a lien on pledged collateral; thus, Bloomfield could not use this collateral to obtain additional financing. It is apparent from its position as a bank that NSB did possess superior bargaining position; however, superiority alone does not create a fiduciary duty. There must be an opportunity to influence. *Schaneman v. Schaneman, supra.* Bloomfield offered no evidence that in this debtor-creditor relationship there was an opportunity to influence. Furthermore, at trial, Bloomfield offered no evidence relating to the disparity of bargaining power between the parties, whether a special relationship existed between the parties (besides that of debtor-creditor), or whether NSB advised Bloomfield on his farming operation. Viewing the evidence most favorably to Bloomfield, we find that the trial court did not err in concluding that Bloomfield failed as a matter of law in establishing a breach of any fiduciary relationship.

The judgment of the district court is affirmed.

AFFIRMED.