**TERRY A. LAMBERT PLUMBING, INC., Appellant,**

v.

**WESTERN SECURITY BANK, formerly doing business as Ames Bank, A Nebraska Banking Corporation and Dennis C. Robey, an individual, Appellees.**

**TERRY A. LAMBERT PLUMBING, INC., Appellee,**

v.

**WESTERN SECURITY BANK, formerly doing business as Ames Bank, A Nebraska Banking Corporation and Dennis C. Robey, an individual, Appellants.**

Nos. 90–2385NE, 90–2524N.E.

United States Court of Appeals, Eighth Circuit.

Submitted March 13, 1991.

Decided June 4, 1991.

Rehearing Denied July 8, 1991.

Jeffrey A. Silver, Omaha, Neb., for appellant.

Patrick M. Heng, Omaha, Neb., for appellees.

Before JOHN R. GIBSON and WOLLMAN, Circuit Judges, and FLOYD R. GIBSON, Senior Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

Terry A. Lambert Plumbing, Inc. ("Lambert") appeals the District Court's[1] grant of summary judgment in favor of Western Security Bank ("Western") and Dennis Robey ("Robey") on all counts of Lambert's amended complaint and grant of summary judgment for Western on Count II of West-

---

1. The Honorable William G. Cambridge, United States District Judge for the District of Nebraska.

ern's counterclaim (No. 90–2385). Western cross-appeals from the denial of Rule 11 sanctions (No. 90–2524). We affirm the district court in all respects in both cases.

## I. BACKGROUND

Lambert was in the business of installing commercial and residential plumbing and had a longstanding banking relationship as a customer of Western. The relationship included loan transactions and the frequent exchange of advice and ideas. Lambert often incorporated Western's advice into its operations. Prior to 1988, Lambert borrowed and repaid working capital funds from Western on several occasions. In 1986, because of an increased need for funds, Lambert received a loan and gave Western a first mortgage on its office property. L & G Properties ("L & G") held a second mortgage on the same property. An officer of Western arranged the transaction and Western's files include information regarding the two liens on the property.

Lambert's business expanded rapidly during 1986 and 1987, and Lambert obtained various loans from Western for business expansion purposes. In 1987, Western had discussions with Lambert concerning Lambert's growth and increased need for working capital. As a result of those discussions, in February, 1988, Lambert and Western entered into two lending agreements. First, the parties executed a loan agreement for $350,000 with the Small Business Administration ("SBA Loan").[2] Lambert gave a mortgage on its office property as security for the SBA Loan. As a prerequisite to its participation, the SBA required a second lien position on the mortgaged property. In the second agreement, Lambert and Western agreed to a $175,000 line of credit ("Credit") which was secured by various Lambert assets, including its accounts receivable. One of the terms of the Credit was that Lambert's failure to fulfill any obligation on any other loan with

Western would constitute a default of the Credit. If Lambert defaulted on the Credit, one of the remedies available to Western was to refuse to make disbursements of funds under the Credit.

Immediately after the SBA Loan was closed on February 28, 1988, Robey, the officer in charge of the Lambert account at Western, left for vacation. In his absence, another officer at Western, without reviewing a title search on the mortgaged property, disbursed substantially all the SBA Loan proceeds to pay trade creditors and to repay existing loans with Western. At the same time, the officer disbursed $42,000 of the Credit to repay another of Lambert's existing loans with Western. Upon his return from vacation, Robey reviewed the title search of the mortgaged office property and discovered that the SBA was in the third lien position on the property.[3] Robey notified Lambert that it was in default of the SBA Loan and demanded that it cure the problem by obtaining a second lien position for the SBA. Also, Robey informed Lambert that the default on the SBA Loan had triggered a default under the Credit and that Western would not advance any further funds until Lambert cured the default on the SBA Loan.

While working to obtain a second lien position for the SBA on its office property, Lambert made several requests for disbursements under the Credit to meet its working capital needs. Western rejected each demand and refused to disburse any funds under the Credit until Lambert cured the default on the SBA Loan. Lambert obtained an offer from L & G to subordinate its second lien position to that of the SBA in return for $20,000. However, because Lambert was unable to obtain any disbursements from the Credit, it was unable to pay L & G to subordinate. In addition to the lien position problem, Lambert developed a problem with its bonding company because Lambert was unable to persuade Western to subordinate its securi-

---

**2.** The SBA participated in the loan by guaranteeing 62% of the principal amount. To effect the SBA participation, Lambert executed an SBA Note in the amount of $350,000.

**3.** Western held the first position and L & G Properties continued to hold the second mortgage on the property.

ty interest in Lambert's assets. Because of a lack of cash flow and the loss of its bonding, Lambert was unable to remain in business. Pursuant to a security agreement under the Credit, Western took possession of most of Lambert's assets, including its accounts receivable. Western liquidated the majority of the assets through an auctioneer who was a customer of Western.

Lambert filed a suit against Western in Nebraska state court, and the suit was later removed to federal district court. Lambert's six-count amended complaint sought monetary damages for racketeering ("RICO Claim") under 18 U.S.C. § 1961 (1988), breach of contract, breach of implied covenant of good faith and fair dealing, injury to business reputation, negligence, and breach of fiduciary duty. Western filed a general denial and a two-count counterclaim for monetary damages for breach of contract on the notes for the SBA Loan and the Credit. Lambert filed a motion for summary judgment on its amended complaint. Western filed motions for summary judgment on the amended complaint, for summary judgment on its counterclaim, and for Rule 11 sanctions against Lambert's attorney. The district court granted Western's motion for summary judgment on the amended complaint, granted summary judgment for Western on Count II of its counterclaim, dismissed Count I of Western's counterclaim, and denied Rule 11 sanctions. Lambert appeals the grant of summary judgment for Western on the amended complaint and on Count II of Western's counterclaim. Western cross-appeals the denial of Rule 11 sanctions.

## II. DISCUSSION

### A. *Standard of Review*

Our standard of review of the district court's grant of summary judgment is well settled:

> In reviewing a district court's grant of summary judgment, this court applies

the same standard as the district court applied, without giving deference to the court below. A court should grant a summary judgment motion if the full record discloses that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. The non-moving party must establish significant probative evidence to prevent summary judgment. In addition, the court must give the benefit of all favorable factual inferences to the party opposing summary judgment.

*Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990) (citations omitted). Also, we must review *de novo* the district court's determinations of state law. *Salve Regina College v. Russell*, —— U.S. ——, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991).

### B. *Lambert's Amended Complaint*

#### 1. RICO

Lambert alleges that Western and Robey engaged in a pattern of racketeering activity within the definition of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c).[4] Lambert claims specifically that Western and Robey committed acts of mail and wire fraud as part of a scheme and conspiracy to defraud Lambert in violation of 18 U.S.C. § 1962(d). The goal of the alleged conspiracy was to destroy Lambert as a viable business entity.

Lambert's contentions are centered on the allegation that Western engaged in a pattern of racketeering activity. In *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Supreme Court discussed the kind of conduct which meets the pattern of racketeering requirement. The Court cited legislative history for the proposition that a pattern must involve both relatedness and continuity. *Id.* at 239, 109 S.Ct. at 2900.

The relatedness requirement involves " 'criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are

---

**4.** The essential elements of a § 1962(c) action are "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima,*

*S.P.R.L. v. Imrex, Co., Inc.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (footnote omitted).

interrelated by distinguishing characteristics and are not isolated events.' " *Id.* at 240, 109 S.Ct. at 2901 (quoting 18 U.S.C. § 3575(e) (Supp. V 1987)). The Court acknowledged the difficulty in formulating a general test for continuity, and stated that:

"Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. It is, in either case, centrally a temporal concept.... A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated.

*Id.* at 241–42, 109 S.Ct. at 2902 (emphasis in original) (citations omitted).

Although not intending to list all possibilities, the Court listed three situations in which a threat of continued racketeering could be established: (1) the predicate acts themselves involve an actual threat of long-term racketeering activity, either implicit or explicit,[5] (2) "the predicate acts or offenses are part of an ongoing entity's regular way of doing business," or (3) the predicate acts "are a regular way of conducting [an] ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes)...." *Id.* at 242–43, 109 S.Ct. at 2902.

The determination of a pattern of racketeering activity is a factual determination. *Id.* at 242, 109 S.Ct. at 2902. "The specific facts of each case must be examined to determine whether the predicate acts relied upon by the plaintiff establish a threat of

continuing racketeering activity." *Sutherland v. O'Malley,* 882 F.2d 1196, 1204 (7th Cir.1989). Although having listed various factors which enter into a pattern of racketeering factual determination, other courts of appeal have emphasized the requirement of a long-term threat of continued criminal activity. *See e.g., Marshall–Silver Constr. Co. v. Mendel,* 894 F.2d 593, 596 (3d Cir. 1990); *Sutherland,* 882 F.2d at 1204; *Parcoil Corp. v. Nowsco Well Serv., Ltd.,* 887 F.2d 502, 504 (4th Cir.1989). The Third Circuit has stated that:

Virtually every garden-variety fraud is accomplished through a series of wire or mail fraud acts that are "related" by purpose and are spread over a period of at least several months. Where such a fraudulent scheme inflicts or threatens only a single injury, we continue to doubt that Congress intended to make the availability of treble damages and augmented criminal sanctions dependent solely on whether the fraudulent scheme is well enough conceived to enjoy prompt success or requires pursuit for an extended period of time. Given its "natural and common sense approach to RICO's pattern element," we think it unlikely that Congress intended RICO to apply in the absence of a more significant societal threat.

*Marshall–Silver,* 894 F.2d at 597.

In *Atlas Pile Driving Co. v. DiCon Fin. Co.,* 886 F.2d 986 (8th Cir.1989), this court addressed an allegation that the defendants employed a pattern of racketeering activity to defraud the plaintiffs. We stated, in regard to the continuity requirement, that a court must "first look to the length of time during which the conduct occurred." *Id.* at 994. We noted that the defendant's conduct, which lasted for over three years, was " 'not sporadic activity,' nor is it the type of conduct occurring 'over a few weeks or months.' " *Id.* (citations omitted). We declined to determine what period of time is needed to establish continuity, but held that the time period in that case was sufficient. *Id.* Finally, we acknowledged

---

**5.** "Suppose a hoodlum were to sell 'insurance' to a neighborhood's storekeepers to cover them against breakage of their windows, telling his victims he would be reappearing each month to collect the 'premium' that would continue their 'coverage.' " 492 U.S. at 242, 109 S.Ct. at 2902.

that a continuity determination must involve a flexible approach.

■ In the case at bar, Lambert correctly asserts that under *H.J. Inc.* a single scheme can constitute a RICO claim. However, the single scheme must still meet the requirements of relatedness and continuity. Lambert claims the continuity requirement is met by a showing that Robey and Western have an ongoing method of doing business that constitutes a continued threat of criminal activity. The criminal activity, according to Lambert, is to defraud contractors through the vehicle of loan defaults and subsequent repossession of secured collateral. Specifically, Lambert asserts that the evidence establishes actions by Robey over a period of years to defraud contractors through a loan scheme. Lambert further argues that the record is replete with evidence of multiple instances of the use of the mails and telephone by Robey, prior to and during his employment with Western, in which he established lines of credit for contractors, declared defaults, refused to distribute proceeds, and liquidated the repossessed collateral. In summary, Lambert claims Robey and Western are a continued threat to conduct a scheme to defraud contractors and that this continuing scheme is a RICO violation.

■ We find that there is no support in the record for the allegation that the prior actions of Robey were conducted in connection with a scheme to defraud other companies. The amended complaint does not allege that Western and Robey acted in regard to any other victims, nor does it allege a threat of continued fraudulent activity. The alleged predicate acts are Western's and Robey's use of the mails and telephone to correspond with Lambert regarding the SBA Loan and the Credit during a very short period of time. Viewing the evidence in the light most favorable to Lambert, this case involves, at most, a plan to defraud a single company in connection with a single set of loan agreements. As noted above, a single transaction which involves only one victim and takes place over a short period of time does not constitute the pattern of racketeering required for long-term criminal activity under a RICO claim. There is no support in the record that a criminal scheme exists involving Robey and Western over a long period of time in connection with more than one victim.

Lambert has essentially attempted to characterize commonly accepted banking procedures as racketeering. Western, through Robey, agreed to lend money to Lambert, and some of the loans were guaranteed by the SBA. Lambert was aware that the SBA Loan required a second mortgage position for the SBA and that funds could not be disbursed until the condition was met. Further, Lambert was aware that the default under the SBA Loan was an event of default under the Credit and that, until the default was cured, Western was not obligated to disburse funds under the Credit. Although Western and Robey were aware at the time of contracting that Lambert's office property was subject to two existing mortgages, they were under no obligation to cure the situation for Lambert. Western was a signatory to the SBA Loan and had to enforce the terms of the agreement; because of the default on the SBA Loan, Western and Robey made a banking decision to refuse to disburse under the Credit until the default was cured.

Banking inevitably involves dealing with problem loans. However, the fact that a bank has had problem loans in the past and has moved to protect its position in regard to a current problem loan is not, by itself, indicative of a pattern of racketeering. Bankers do not become racketeers by acting like bankers. We agree with the statement by the Fourth Circuit that:

> If the pattern requirement has any force whatsoever, it is to prevent this type of ordinary commercial fraud from being transformed into a federal RICO claim. If we were to recognize a RICO claim based on the narrow fraud alleged here, the pattern requirement would be rendered meaningless.

*Menasco, Inc. v. Wasserman*, 886 F.2d 681, 685 (4th Cir.1989) (citations omitted). Foreclosing on problem loans is not a criminal act and having had problem loans in the past does not make one a racketeer. Mere

allegations cannot raise a single transaction to the level of RICO. We find no genuine issue of material fact as to Lambert's RICO claim and therefore hold that Western and Robey were correctly granted summary judgment.

### 2. Breach of Contract

■ Lambert alleges that Western and Robey breached the terms of the Credit by refusing to advance funds at Lambert's request. Lambert admits that a second lien position for the SBA was a condition to disbursement under the SBA Loan and that it was in default of that condition. However, Lambert asserts that the default had no effect on the Credit because the SBA Loan and the Credit were separate agreements and Western was not a party to the SBA Loan between Lambert and the SBA. Thus, Western could not refuse to advance funds based on a default of the SBA Loan. Because there were no conditions in the Credit as to advances of funds, Western had no right to refuse Lambert's requests. Lambert also argues that the default of the SBA Loan was caused by Western and Robey because they had control over Lambert's ability to obtain the necessary second lien position for the SBA,[6] and they should not be permitted to benefit from their own wrongdoing. Finally, Lambert contends that Western and Robey waived any possible lien condition in the Credit when they made an initial disbursement of funds from the SBA Loan without first reviewing the title search.

The Credit clearly requires, as a condition to receiving disbursements thereunder, that Lambert not be in default under any other agreement with Western. Lambert, by its own admission, was in default of the SBA Loan. Therefore, Western was under no obligation to advance further funds until Lambert cured the default. Lambert's claim that Western was not a party to the SBA Loan is without merit. Although the SBA Loan involved the SBA as a guarantor, Western was a signatory to the agreement and had a responsibility to enforce the agreement. Thus, Western and Robey were clearly within their rights under the Credit to refuse to disburse funds until Lambert cured the default under the SBA Loan.

There is no issue as to Western and Robey profiting from their own wrongdoing because they did nothing wrong. They were fully within their rights under the Credit to refuse Lambert's requests for funds until it cured its default of the SBA Loan. Lambert's argument regarding waiver is without merit because the SBA Loan provided that the first disbursement could be made in the absence of title insurance, so long as the title insurance was obtained immediately thereafter. Therefore, Western did not waive its right to enforce the default provisions of the Credit once it became aware of Lambert's default under the SBA Loan. Because of the unambiguous terms of the SBA Loan and Credit, we find no genuine issue of material fact as to Lambert's breach of contract claim and hold that Western and Robey were correctly granted summary judgment.

### 3. Breach of Implied Covenant of Good Faith and Fair Dealing

Lambert alleges that Western and Robey breached an implied duty of good faith and fair dealing towards Lambert because (1) they knew Lambert was in a capital intensive business, (2) they knew Lambert needed the proceeds from the Credit to stay in business, (3) disbursing the proceeds would not cause Lambert to exceed its lending limit, (4) they disbursed enough proceeds to pay preexisting loans of Lambert with Western, (5) they knew at the time of contracting that there were two preexisting mortgages on Lambert's office property, and (6) they refused to subordinate their secured position in Lambert's accounts receivable to Lambert's bonding company even though they knew failure to obtain bonding would force Lambert out of business.

■ Lambert correctly asserts that under Nebraska law there is an implied

---

**6.** The control alleged is that Western and Robey refused to disburse money under the Credit that would have allowed Lambert to pay for the subordination of L & G.

good faith obligation in the performance of every contract or duty within the Nebraska Uniform Commercial Code. *Bloomfield v. Nebraska State Bank,* 237 Neb. 89, 465 N.W.2d 144 (1991); *Yankton Production Credit Ass'n v. Larsen,* 219 Neb. 610, 365 N.W.2d 430 (1985). However, Lambert incorrectly applies the holdings in those two cases and in *K.M.C. Co. v. Irving Trust Co.,* 757 F.2d 752 (6th Cir.1985), to the facts in this case. Lambert maintains that those cases stand for the proposition that there is "an implied obligation of good faith imposed on a lender to give notice to a borrower before refusing an advancement under an agreement to extend credit unless the refusal without notice was made in good faith on the basis that the borrower's financial condition would not support such a loan." Appellant's Brief at 30 (quoting *Gilbert Central Corp. v. Overland National Bank,* 232 Neb. 778, 786, 442 N.W.2d 372, 377 (1989)[7]). Although the statement of the proposition is accurate, the facts in the case at bar are distinguishable from the facts of the cases upon which Lambert relies.

■ In the above cases, the credit agreements gave the lenders total discretion, based on the borrowers' credit conditions, as to when to make disbursements. The cases involved a determination by the lenders that the borrowers were in financial trouble and a subsequent refusal to disburse funds. In the case at bar, the terms of the Credit include an express condition that Western was under no obligation to disburse proceeds while Lambert was in default of any loan obligation with Western. As already discussed, Lambert's default of the SBA Loan was a default under the terms of the Credit. Thus, Western's refusal to advance funds was not based on a discretionary decision that Lambert was financially unstable, but rather on express terms of default in a loan agreement which Lambert signed. Acting according to express terms of a contract is not a breach of good faith and fair dealing.

In regard to the claim that Western refused to subordinate its secured position in

Lambert's accounts receivable to allow Lambert to obtain bonding, the record indicates that Lambert's bonding company had initially agreed to continue writing bonds for Lambert despite Western's priority secured position and that Western would have agreed to subordinate on a job-by-job basis. More importantly, there is no evidence in the record that Western was under any obligation to subordinate its secured position to assist Lambert in obtaining bonding. Accordingly, we find no genuine issue of material fact as to Lambert's claim of breach of implied duty of good faith and fair dealing and hold that Western and Robey were correctly granted summary judgment.

### 4. Injury to Business Reputation

Lambert alleges that because Western and Robey breached the terms of the Credit, failed to exercise good faith and fair dealing towards Lambert, and refused to subordinate Western's priority position in Lambert's accounts receivable, Lambert was unable to perform its jobs, with the result that its business reputation was damaged. We do not doubt that going out of business damaged Lambert's business reputation. However, because Western and Robey did not breach the terms of the Credit or any obligation to subordinate or deal fairly, we cannot find that a factual dispute exists whether Western or Robey are legally responsible for Lambert's business failure and subsequent damaged reputation. Thus, we affirm the grant of summary judgment.

### 5. Negligence

■ Lambert alleges that Western and Robey were negligent in their performance under the Credit. Lambert correctly maintains that accompanying every contract under Nebraska law there is "a common-law duty to perform with care, skill, reasonable expediency, and faithfulness the thing agreed to be done." *Lincoln Grain, Inc. v. Coopers & Lybrand,* 216 Neb. 433, 437, 345 N.W.2d 300, 305 (1984). However, in the case at bar, the "thing agreed to be

**7.** This statement cites *K.M.C. Co.,* 757 F.2d at    759, and paraphrases the holding in *K.M.C. Co.*

done" was that Western would disburse funds under the Credit so long as Lambert was not in default under any loan agreement with Western. For all the reasons already discussed, Western and Robey did not negligently perform under the Credit and were correctly granted summary judgment.

### 6. Breach of Fiduciary Duty

■ Lambert alleges that Western's failure to disburse funds under the Credit constituted a breach of a fiduciary duty owed to Lambert. Lambert maintains that over the course of many years it had developed a relationship with Western in which Western would advise Lambert in all aspects of its business operations and that Lambert consistently relied on the advice. In effect, Lambert characterizes the relationship with Western as one of confidence, trust, and reliance. Lambert further argues that Western knew about Lambert's complete trust and that Lambert would rely on Western to disburse funds pursuant to the Credit, despite any problems with the SBA loan.

Lambert also asserts that Western and Robey projected themselves into Lambert's operations as a part of the process of negotiating the SBA Loan and the Credit. Specifically, Lambert claims that Robey, as part of the SBA Loan transaction, suggested salaries for Lambert's executives, limited Lambert's capital investments and lease expenditures, required primary bank accounts with Western, and set various other restrictions on Lambert's operations as conditions to making the loans. Lambert maintains that Western's day-to-day involvement in Lambert's business and its actual ability to compel Lambert to agree to restrictions on operations as a condition to making the loans placed Western in a fiduciary position in relation to Lambert.

The Nebraska Supreme Court recently addressed the issue of a lender's confidential relationship. The court stated that a confidential relationship "exists between two persons if one has gained the confidence of the other and purports to act or advise with the other's interest in mind." *Bloomfield*, 237 Neb. at 96, 465 N.W.2d at 149 (quoting *Boettcher v. Goethe*, 165 Neb. 363, 378, 85 N.W.2d 884, 892 (1957))[8]. The court noted that the bank could control the borrower's financing ability because of the bank's superior status in the relationship. *Id.* However, the court cautioned that "superiority alone does not create a fiduciary duty. There must be an opportunity to influence." *Id.* (citation omitted).

In the case at bar, Lambert has injected nothing to indicate that the normal financial relationship between a lender and a borrower was elevated to the level of a fiduciary relationship. Inserting restrictive covenants and conditions into a loan agreement is a common practice in the lending industry. The record indicates that Western placed certain restrictive covenants in the SBA Loan and Credit, but the restrictions were in no way unusual in the lending context. Lambert was a business entity with many years of experience, capable of entering into a lending agreement requiring certain specific restrictions on its activities. Western performed all of its obligations under the terms of the Credit and did not breach any fiduciary duty owed to Lambert. There is no genuine issue of material fact as to Lambert's breach of fiduciary duty claim and hold that Western and Robey were correctly granted summary judgment.

### C. *Western's Counterclaim*

The district court granted summary judgment to Western on its claim that Lambert breached the note executed in regard to the Credit and awarded damages in the amount of $48,751.46. Lambert appeals the judgment because (1) Western precipitated the breach and should not be allowed to take advantage of the breach and (2) Western failed, under Nebraska's version of § 9–207(1) of the Uniform Commercial Code ("UCC"), to preserve and protect the

---

**8.** In assessing Lambert's claim on the fiduciary issue, we accept the citation of the Nebraska cases dealing with a confidential relationship as having some relevance, but we do not necessarily equate the concept of confidential relationship with fiduciary duty.

value of the collateral it repossessed from Lambert. Lambert maintains that Robey has failed to keep track of how many accounts have been paid and is not aware of whether Lambert's bonding company has collected any of the bonded receivables.

For reasons already discussed, Lambert's claim that Western precipitated the breach of the note pursuant to the Credit is without merit. It was Lambert's, not Western's, responsibility to obtain the second lien position for the SBA and to avoid a default under the terms of the agreement. In regard to the UCC claim, Robey turned the accounts receivable over to the SBA because of the SBA's guarantee of the SBA Loan. The record does not support a claim that Robey or Western failed to adequately protect the value of Lambert's receivables. The UCC requires a creditor to act in a commercially reasonable manner regarding the storage, sale, or disposition of the collateral, and the fact that Robey released the accounts to the SBA is not evidence of failure to protect their value. If anything, Lambert would have a complaint with the SBA's handling of the accounts. We find no genuine issue of material fact regarding Lambert's breach of the note under the Credit and hold that Western was correctly granted summary judgment.

### D. Western's Motion for Rule 11 Sanctions

Western moved for Rule 11 sanctions against Lambert's attorney for the filing of the amended complaint and, in particular, the RICO claim. The district court denied the motion. On appeal, Western maintains that a RICO allegation is a very serious claim that can taint the reputation of the accused and should not be brought without careful research of the applicable law and adequate discovery of the factual basis for the claim.

We have held that "in determining whether a violation of Rule 11 has occurred, the district court must apply an 'objective reasonableness' standard." *N.A. A.C.P.—Special Contribution Fund v. Atkins*, 908 F.2d 336, 339 (8th Cir.1990) (quot-

ing *O'Connell v. Champion Int'l Corp.*, 812 F.2d 393, 395 (8th Cir.1987)). We review a district court's decision to grant or deny sanctions only upon an abuse of discretion. *E.g., Crookham v. Crookham*, 914 F.2d 1027, 1029 (8th Cir.1990). Although we cannot say that we would not have imposed sanctions had we been sitting as the district court, we find no abuse of the district court's discretion in denying Western's request for sanctions.

### III. CONCLUSION

This case is a contract dispute and is resolved by the unambiguous terms of the agreements. For all the reasons already discussed, we find no genuine issues of material fact as to any of Lambert's claims in its amended complaint and, therefore, affirm the district court's grant of summary judgement to Western and Robey on all counts of the amended complaint and the judgement for Western on Count II of its counterclaim. Further, because we find that the district court did not abuse its discretion in denying Western's request for Rule 11 sanctions, we affirm its denial of Western's motion.