SOLAR MOTORS, INC., FORMERLY KNOWN AS BAKER CHRYSLER, PLYMOUTH, DODGE, INC., AND BRETT R. BAKER, APPELLEES AND CROSS-APPELLANTS, V. FIRST NATIONAL BANK OF CHADRON, APPELLANT AND CROSS-APPELLEE.

537 N.W.2d 527

Filed September 5, 1995. No. A-93-622.

Trev E. Peterson and Rodney M. Confer, of Knudsen, Berkheimer, Richardson & Endacott, for appellant.

Steven M. Olsen, of Simmons, Olsen, Ediger & Selzer, P.C., for appellees.

Robert J. Hallstrom, of Brandt, Horan, Hallstrom & Sedlacek, for amicus curiae Nebraska Bankers Association, Inc.

HANNON, MILLER-LERMAN, and INBODY, Judges.

HANNON, Judge.

This is a lender liability action in which Solar Motors, Inc., and Brett R. Baker sued the First National Bank of Chadron on the basis that it failed to finance the plaintiffs' business as promised. The trial court submitted the case to the jury on the theory that the bank breached its obligation of good faith and fair dealing by calling the two loans it made to Solar Motors, but refused to submit the case to the jury on a "breach of contract" theory. The jury awarded the plaintiffs a verdict for $204,357, and the bank appeals from that verdict. The plaintiffs cross-appeal, alleging that the trial court erred in failing to submit the case on a breach of contract theory and that it did not correctly define the term "good faith" in the jury instructions. We conclude that the bank did not breach any obligation of good faith or fair dealing when it demanded

payment of the promissory notes, that the court should have directed a verdict, and that the court correctly refused to submit the case to the jury on the theory of breach of contract. Other issues argued by the parties are considered moot and not discussed. We reverse, and remand with directions to set aside the judgment and dismiss the action.

## I. SUMMARY OF FACTS

Since we conclude that the outcome of this action is determined by the terms of written documents, the oral conversations between the parties and their previous dealings will only be discussed as necessary to frame the issues.

Baker was employed by Northwest, Inc., as its office manager from 1985 to October 1988. That company was engaged in the business of selling both farm implements and automobiles in Chadron, Nebraska, and it operated a Chrysler franchise in Crawford, Nebraska. In September 1988, Baker had the opportunity to buy Northwest's automobile business, including the parts and service departments and its Chrysler franchise. In order to buy this business, it was necessary for Baker to arrange to buy a building and equipment from a third party, Jake Brill, to make a specific agreement with Northwest about purchasing its automobile business, to obtain Chrysler's agreement to issue him a franchise and to finance his new car inventory, and to obtain First National's agreement to finance his used car inventory and the purchase of parts and equipment. Baker made these arrangements during the fall of 1988.

On October 5, 1988, Baker purchased Northwest's car business, paying $133,000 for parts, tools and equipment, the Chrysler franchise, and a covenant not to compete. On October 10, 1988, Baker and his wife purchased the building, furniture, fixtures, equipment, and inventory of Solar Motors Inc. (a different entity than the plaintiff corporation in this action), for $200,333.12 payable in installments. During this time, the bank agreed to finance his used-car inventory and the purchase of parts and equipment. On December 20, during Baker's dealings with Chrysler, the bank wrote a letter to Chrysler stating that it had "agreed to finance the Used Car line with a new Corporation owned by Brett Baker" and to finance the purchase

of equipment on a 7-year amortized loan. On December 23, First National issued a letter addressed "To whom it may concern," stating that it had committed itself to lend the corporation Baker was forming $40,000 to purchase parts from Northwest "to be returned to Chrysler" and $40,000 on a 7-year amortization for the purchase of equipment.

During this time, Baker formed a new corporation that is one of the plaintiffs in this action, and by the time this action was started, that corporation was named "Solar Motors, Inc." Baker conducted all of his car business through that corporation. He and his wife retained ownership of the contract under which they purchased the property from Brill, and they rented that equipment and property to Solar Motors. Solar Motors was the only business entity that did business with the bank concerning the subject of this action. Baker is the president of Solar Motors and manages its operations.

The business was not put together all at one time. On December 19, 1988, Solar Motors signed a $125,000 promissory note to the bank for the floor plan financing of used automobiles. From time to time, when the outstanding balance of this loan exceeded $125,000, Solar Motors issued additional temporary notes to cover the excess. On December 19, Solar Motors also executed a financing statement and a security agreement purporting to give the bank a perfected security interest in much of the corporation's property to secure any existing or future debts. On May 11, 1989, Solar Motors executed the $40,000 loan for equipment. Both of these notes were prepared on identical, standard forms that contained the requisite blanks for a variety of different note types. The $125,000 note was filled out to provide for payment on demand, and the $40,000 note was filled out to require monthly payments of $728 over 7 years. The $125,000 note was later replaced with a note identical to the first except for date and interest rate.

Solar Motors made a profit in some months and lost money in other months. In June 1989, the bank complained that some cars had been on the floor plan for more than 6 months, and it also advised Solar Motors that it had commenced a new policy whereby it would hold the titles to all floor planned vehicles.

The bank honored Solar Motors' overdrafts as it had those of Northwest while Baker was working there. However, on February 16, 1990, it returned for insufficient funds two checks drawn by Solar Motors to pay Chrysler. On February 20, the money that was due because of the returned checks was wired to Chrysler, and the bank's president wrote Chrysler a letter at Baker's request in which he tried to allay any fears the returned checks might have engendered in Chrysler's representatives.

On March 5, 1990, First National wrote Solar Motors a letter stating that after reviewing the financial information it recently obtained, "we will require the following changes to be made in order to continue with the $125,000 floor plan line." Among the several changes listed in that letter were a limitation of the age of the vehicle the bank would finance, a rule that no personal draws would be financed, the imposition of a "hard charge" on Solar Motors' account because the bank thought the account was unprofitable, and an increase in the interest rate on the floor plan obligation. The letter caused considerable discussion between the parties. In its instructions to the jury, the court refers to the plaintiffs' claim that Solar Motors was not in default under the terms of this letter.

On August 23, 1990, First National wrote Solar Motors a letter demanding payment of the balance on both loans, which at the time was $35,984.15 on the equipment note and $100,564.32 on the note to finance the floor plan. Baker asked the bank to continue its financing, and in a letter dated November 6, 1990, the bank wrote Solar Motors, offering to make a "new commitment" under the terms specified in that letter. In that letter, the bank offered to continue for only 6 months if the stated requirements were followed by Baker and said that Baker must show "improvement at the end of the 6 month period for us to continue." That letter stated the offer remained open until November 15. The evidence does not show Solar Motors accepted the offer. Baker sought financing from other banks, but he found their terms to be unsatisfactory. On April 1, 1991, the bank wrote Solar Motors a letter stating that if the obligations were not paid in full by April 22, legal action would be commenced. On May 7, a new demand was made for payment of the balance of $33,702.72 on the equipment note

and $42,219.82 on the floor plan note. Later, the matter was turned over to the bank's attorney, and the notes were paid in full on June 24, 1991.

After the bank initially demanded that Solar Motors pay its notes, it did not loan Solar Motors any additional money to finance its used–car inventory. Solar Motors made payments on the floor plan note as it sold vehicles covered by it. Baker testified that the decline in Solar Motors' business was attributable to its inability to accept trade–in vehicles when selling new vehicles due to First National's refusal to continue Solar Motors' used–car floor plan financing. The business in Solar Motors' parts department also declined after August 1990 due to a decline in new–car purchases. Solar Motors voluntarily terminated its Chrysler franchise effective January 1991. Baker attempted to obtain financing for Solar Motors from other lending institutions, but either the institutions would not make the loan or Solar Motors was unwilling to accept the terms of any loan offered by other banks.

The plaintiffs introduced substantial evidence tending to establish their damages by way of lost profits, lost value of the franchise, and other expenses incurred. Since we find the plaintiffs failed to establish liability, we will not summarize the evidence on damages.

## II. PLAINTIFFS' PETITION

In summary, the plaintiffs' petition alleges the purchase of the property by Baker and Solar Motors as outlined above; that in 1988, and again in 1990, the bank agreed to provide financing for Solar Motors' inventory of used automobiles and the purchase of equipment and parts from Northwest to stock the new business; that the agreement was "made verbally" and was then reflected in the letters described above dated December 20 and 23, 1988, and the promissory notes described in this opinion; and that the plaintiffs relied upon the bank's advice, encouragement, representations, and previous course of dealing in purchasing the property both as a corporation and as an individual. The plaintiffs further allege that when the bank demanded payment in August 1990, it breached its agreement to continue the floor plan financing established by the bank's

pattern and custom and the expectations of the plaintiffs in relying upon such pattern and custom, and that the bank did not provide financing for the $40,000 for parts as agreed.

Upon the basis of these allegations, the plaintiffs pled five theories of recovery, calling them "causes of action," under the following headings: (1) breach of contract, (2) breach of contract—good faith and fair dealing, (3) negligence, (4) misrepresentation, and (5) breach of fiduciary duty. Without being specific, the plaintiffs prayed for $413,718 in damages. The trial court instructed the jury only upon the second listed theory of breach of the duty of good faith and fair dealing.

In summary, the trial court instructed the jury that the plaintiffs claimed the bank agreed to provide financing and "breached that agreement to provide financing under the floor line note"; breached the covenant of good faith and fair dealing by calling that note on August 23, 1990; breached its agreement with the plaintiffs for continued floor plan financing established by the bank's pattern and custom and by the plaintiffs' expectations resulting therefrom; and treated them in a manner not in good faith. The court instructed the jury that it should find for the plaintiffs if it found by a preponderance of the evidence that the parties entered into the contract; that "the obligation to perform a contract in good faith and fair dealing requires that actions be taken based on a reasonable, good faith business judgment"; and that the bank breached the obligation of good faith and fair dealing, which resulted in damages. The jury awarded the plaintiffs a verdict of $204,357, and they were also awarded costs.

### III. ASSIGNMENTS OF ERROR

First National appeals, alleging the district court erred as follows: (1) in determining that an implied covenant of good faith and fair dealing could govern the bank's decision to call a demand note, (2) in instructing the jury on both an objective and a subjective definition of good faith, (3) in submitting the issue of good faith to the jury, and (4) in submitting Baker's individual claim for damages. In addition, First National assigns errors in connection with damages. However, our conclusion regarding the issue of liability raised under its first assignment

of error makes consideration of its other assignments moot. Regarding the fourth assignment of error, the inclusion of Baker individually as a plaintiff in this case is confusing and probably improper. However, we do not consider this question because it would not affect the outcome of this appeal.

Solar Motors and Baker cross-appeal, alleging the district court erred in refusing to instruct the jury on the breach of contract theory. This issue will be separately considered later in this opinion. Solar Motors also alleges the trial court erred by instructing the jury on a subjective standard for the duty of good faith and fair dealing. This assignment is rendered moot by our decision on First National's appeal.

## IV. STANDARD OF REVIEW

A jury verdict will not be set aside unless clearly wrong, and it is sufficient if there is any evidence presented to the jury upon which it could find for the successful party. *Nichols v. Busse*, 243 Neb. 811, 503 N.W.2d 173 (1993); *Bartunek v. Geo. A. Hormel & Co.*, 2 Neb. App. 598, 513 N.W.2d 545 (1994). As to questions of law, an appellate court has an obligation to reach a conclusion independent from a trial court's conclusion in a judgment under review. *George Rose & Sons v. Nebraska Dept. of Revenue*, 248 Neb. 92, 532 N.W.2d 18 (1995); *Unland v. City of Lincoln*, 247 Neb. 837, 530 N.W.2d 624 (1995).

## V. DISCUSSION

### 1. Good Faith and Demand Note

There are no Nebraska cases that consider whether a holder of a demand note may demand payment in the absence of a good faith business judgment to do so. A number of other jurisdictions have considered this question, and the vast majority of them have concluded that the holder of a demand note may demand payment at any time for any reason or for no reason.

In *Mirax Chemical v. First Interstate Commercial*, 950 F.2d 566 (8th Cir. 1991), the court held the demand provision in the loan agreement made the loan a demand obligation and that neither an unnecessary acceleration clause nor § 1-208 of the Uniform Commercial Code imposed the duty of good faith on

the lender when making a demand. In *Kham & Nate's Shoes No. 2 v. First Bank*, 908 F.2d 1351 (7th Cir. 1990), the court held the lender had the right to call demand notes for any reason satisfactory to itself. In this appeal from the ruling of a bankruptcy judge, the court stated, "The principle is identical to that governing a contract for employment at will: the employer may sack its employee for any reason except one forbidden by law, and it need not show 'good cause.'" *Id.* at 1358. The court further stated, "[W]e are not willing to embrace a rule that requires participants in commercial transactions not only to keep their contracts but also do 'more'—just how much more resting in the discretion of a bankruptcy judge assessing the situation years later." *Id.* at 1356.

In *Taggart & Taggart Seed v. First Tenn. Bank Nat.*, 684 F. Supp. 230 (E.D. Ark. 1988), *aff'd* 881 F.2d 1080 (8th Cir. 1989), the court held the defense of good faith under § 1–203 of the Uniform Commercial Code was not available to prevent collection of a demand note and cited § 1–208 as one of the reasons.

In *Pavco Industries v. First Nat. Bank*, 534 So. 2d 572 (Ala. 1988), the lender obtained summary judgment against the borrower's claim that the lender made an oral promise not to demand payment and the borrower's claim that the default provisions effected a change in the demand note.

The situation of the parties in *Centerre Bank of Kansas City v. Distributors*, 705 S.W.2d 42 (Mo. App. 1985), was similar to that of the parties in the instant case. In *Centerre Bank of Kansas City*, the borrowers were operating a business which had been purchased with a loan from a bank evidenced by a demand note. Later, the bank demanded payment of the note. A jury awarded the borrowers a $7,528,880 verdict on the basis that the bank did not make the demand in good faith. In reversing that decision, the Missouri court stated the following:

> The imposition of a good faith defense to the call for payment of a demand note transcends the performance or enforcement of a contract and in fact adds a term to the agreement which the parties had not included. . . . The

parties by the demand note did not agree that payment would be made only when demand was made in good faith but agreed that payment would be made whenever demand was made.

*Id.* at 48.

The following cases from other jurisdictions have similar holdings: *Spencer Companies v. Chase Manhattan Bank, N.A.*, 81 B.R. 194 (D. Mass. 1987); *Simon v. New Hampshire Sav. Bank*, 112 N.H. 372, 296 A.2d 913 (1972); *Flagship Nat. Bank v. Gray Distribution Syst.*, 485 So. 2d 1336 (Fla. App. 1986); *Fulton National Bank v. Willis Denney Ford, Inc.*, 154 Ga. App. 846, 269 S.E.2d 916 (1980); and *Allied Sheet Met. v. Peoples Nat'l Bk.*, 10 Wash. App. 530, 518 P.2d 734 (1974).

There are a few cases with a minority view. In *K.M.C. Co., Inc. v. Irving Trust Co.*, 757 F.2d 752 (6th Cir. 1985), a loan agreement contained a demand provision, and no notice of demand was given. The court stated, "[t]he demand provision is a kind of acceleration clause, upon which the Uniform Commercial Code and the courts have imposed limitations of reasonableness and fairness." *Id.* at 760. We do not agree that a demand provision is a kind of acceleration clause. The *K.M.C. Co., Inc.* court cites § 1–208 of the Uniform Commercial Code and *Brown v. AVEMCO Inv. Corp.*, 603 F.2d 1367 (9th Cir. 1979), to support that proposition. *Brown* deals exclusively with the good faith requirement of various types of acceleration clauses and does not mention demand notes at all. *Brown* is concerned with using the acceleration clause as an excuse to advance the due date of a promissory note and as such does not consider the question we are considering. *Reid v. Key Bank of Southern Maine, Inc.*, 821 F.2d 9 (1st Cir. 1987), is also considered to be a case espousing the minority view and cites *K.M.C. Co., Inc.* as authority. In *Reid*, a loan agreement provided for a loan commitment, and the lender demanded payment under the demand note before the commitment was fulfilled.

The cases from other jurisdictions that considered this issue address some or all of the three following arguments put forth by borrowers to support their positions. They are:

## (a) Good Faith Under § 1-203

First, the plaintiffs argue that the bank's demand is controlled by Neb. U.C.C. § 1-203 (Reissue 1980), which provides, "Every contract or duty within this act imposes an obligation of good faith in its performance or enforcement." To support their argument on this point, the plaintiffs rely upon *Bloomfield v. Nebraska State Bank*, 237 Neb. 89, 465 N.W.2d 144 (1991); *Gilbert Central Corp. v. Overland Nat. Bank*, 232 Neb. 778, 442 N.W.2d 372 (1989); and *Yankton Prod. Credit Assn. v. Larsen*, 219 Neb. 610, 365 N.W.2d 430 (1985). These cases do not consider the rights of a holder of a demand note, but, rather, the limits of good faith when a lender refuses to fulfill a commitment to make a loan. They support the proposition that lenders, as do other parties to a contract, have a general obligation of good faith and fair dealing under the Uniform Commercial Code. However, these cases do not address whether the general obligation to act in good faith limits the rights of a holder of a demand note to call the note at any time for any reason or for no reason.

"Statutory interpretation is a matter of law in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determination made by the court below." *Anderson v. Nashua Corp.*, 246 Neb. 420, 425, 519 N.W.2d 275, 280 (1994).

> In construing a statute, a court must look at the statutory objective to be accomplished, the problem to be remedied, or the purpose to be served, and then place on the statute a reasonable construction which best achieves the purpose of the statute, rather than a construction defeating the statutory purpose.

*Durand v. Western Surety Co.*, 245 Neb. 649, 651, 514 N.W.2d 840, 842 (1994).

Large lending institutions rarely call a demand note because they need the money, but, rather, from concerns somehow related to the ultimate collection of the money loaned. The principal reason lenders call notes is that the lenders believe the borrowers might be heading in a direction where it would be more difficult or impossible to collect the loaned funds. An experienced banker once observed, partly in jest, that

anyone can loan money; the secret is in getting it back. As long as the borrower agrees, we see nothing legally wrong with a lender reserving the right to call a loan at any time. Such an arrangement gives the lender a clear right to protect his, her, or its position by calling the loan at any time, unfettered by any concern that a judge or a jury might not agree with the lender's judgment. Traditionally, lenders obtain the right to call a loan at any time for any reason or for no reason by loaning on a demand note. If a lender could only call a demand note based upon a good faith business judgment, a loan upon a demand note would become a loan for indefinite time. We conclude the proper interpretation of § 1–203 is that the general duty of good faith does not require a lender to call a demand note only upon a good faith business judgment.

### (b) Acceleration Clause

The second argument is based upon the interpretation of a demand promissory note that also contains an acceleration clause. The documents in this case have an acceleration clause as quoted below in this opinion. Such a provision is obviously unnecessary in the case of a demand note. In the case at hand, all of the promissory notes were prepared from a standard form. These standard forms necessarily include acceleration provisions for those instances when the note is to be an installment note, or a term note. The security agreement used to secure Solar Motors' obligation also contains a similar acceleration clause. If the bank had called the $125,000 note under the acceleration clause and not the demand provision, Neb. U.C.C. § 1–208 (Reissue 1992), discussed below, would have allowed the bank to call the loan only upon a good faith opinion that the security was impaired or if the risk of the loan's defaulting had increased.

### (c) Effect of § 1–208

The third argument is based upon § 1–208, which reads as follows:

A term providing that one party or his successor in interest may accelerate payment or performance or require collateral or additional collateral "at will" or "when he deems himself insecure" or in words of similar import

shall be construed to mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against whom the power has been exercised.

The plaintiffs argue that a demand is an acceleration, and therefore, this statute imposes the burden of good faith in demanding payments. We disagree. A demand is not an acceleration. "Instruments payable on demand include those payable at sight or on presentation and those in which no time for payment is stated." Neb. U.C.C. § 3–108 (Reissue 1980). "'Acceleration' requires a change in the date of maturity from the future to the present." *Production Credit Ass'n of Fargo v. Ista*, 451 N.W.2d 118, 122 (N.D. 1990). A payment date, which does not by definition exist in a demand note, cannot be moved.

Also, under the "Purposes" section of the comment for § 1–208, the following is stated: "Obviously this section has no application to demand instruments or obligations whose very nature permits call at any time with or without reason. This section applies only to an agreement or to paper which in the first instance is payable at a future date." Section 1–208 simply does not apply to demand notes.

As stated previously, when interpreting a statute, a court must look at the statutory objective to be accomplished, the problem to be remedied, or the purpose to be served, and then place on the statute a reasonable construction which best achieves the purpose of the statute, rather than a construction defeating the statutory purpose. *Durand v. Western Surety Co.*, 245 Neb. 649, 514 N.W.2d 840 (1994). We conclude that § 1–208 does not apply to a note payable on demand.

We conclude that the holder of a demand note may demand payment at any time for any reason or for no reason.

## 2. PAROL EVIDENCE

### (a) Promissory Notes

The petition and the jury instructions seem to ignore the distinction between the $125,000 note and the $40,000 note. By its terms, the $125,000 note was payable on demand. The

$40,000 promissory note was a 7-year amortized obligation. Obviously, the bank could not demand payment of the 7-year note at any time. However, the 7-year promissory note contains provisions that would cause the note to be in default and thus payable. The two provisions which might apply in this case are as follows:

> The Borrower shall be in default [when] (1) the Borrower shall fail to pay, when due, any amount required hereunder. [or] (5) any change . . . occurs in the condition or affairs (financial or otherwise) of the Borrower or any Guarantor of this promissory note which, in the opinion of the Lender, impairs the Lender's security or increases its risk with respect to this promissory note.

The note also provides that "[u]nless prohibited by law, the Lender may, at its option, declare the entire unpaid balance of principal and interest immediately due and payable without notice or demand at any time after default, as such term is defined in this paragraph."

■ The evidence does not show that Solar Motors had failed to keep its payments current before the bank's demand on August 23, 1990, and whether the bank would have been justified in calling the note based on some opinion of increased risk would be a jury question. However, we do not reach this question. The bank did not seek to foreclose, and Solar Motors did not pay the balance after the demand on August 23. The note was not paid until June 24, 1991, after considerable negotiations and a further demand by the bank on May 7. At that time, the note was in default under the express terms of the note because Solar Motors had not made all of the monthly payments. There is no question that when a note is overdue and in default, a bank is entitled to call it. See *Bloomfield v. Nebraska State Bank*, 237 Neb. 89, 465 N.W.2d 144 (1991). There is no question that the $125,000 note was payable on demand.

We next consider whether other evidence might change the effect of the provision in the promissory notes Solar Motors gave to First National.

(b) Effect of Parol Evidence Rule

The plaintiffs' petition is based upon the theory that the contract controlling the parties' rights is composed of an agreement "made verbally" in the fall of 1988 regarding the bank's willingness to finance Solar Motors, along with the letters of December 1988 and the provisions in the $125,000 and $40,000 notes, and the bank's statement that it would not continue financing Solar Motors unless it agreed to the changes listed in the letter dated March 5, 1990, along with the bank's pattern and custom and the expectations of the plaintiffs in relying upon such pattern and custom of the bank with other customers. The court's jury instructions submitted this theory, but limited it to the plaintiffs' claim that the bank breached an implied obligation not to call the note financing the used-car inventory by a call not based upon a good faith business judgment. In the following discussion, we conclude the plaintiffs' position is incorrect because the parol evidence rule bars the admissibility of prior oral agreements to a written contract, and the evidence of "pattern and custom" cannot modify the terms of a promissory note that is not ambiguous. Furthermore, evidence does not establish that the letter dated March 5, 1990, changed the terms of the promissory note because that letter does not propose any change in the demand provision of the loan documents, and even if it did, there is no evidence that these terms were accepted.

The usual statement of the parol evidence rule is that parol or extrinsic evidence will not be received to vary or add to the terms of a written agreement. *Traudt v. Nebraska P. P. Dist.*, 197 Neb. 765, 251 N.W.2d 148 (1977). "The parol evidence rule renders ineffective proof of a prior or contemporaneous oral agreement which alters, varies, or contradicts the terms of a written agreement." *Five Points Bank v. White*, 231 Neb. 568, 571, 437 N.W.2d 460, 462 (1989). "A note in the usual commercial form is a complete contract in itself, and its terms cannot be varied or contradicted by parol evidence." *Id.* The terms of repayment are dictated by the terms contained in a promissory note.

Assuming but not deciding that in the fall of 1988, the bank made a binding commitment to loan Baker money to establish

a car business, the terms of that agreement were fulfilled insofar as the loan to finance the used–car inventory is concerned by the loan made in December 1988, and the commitment to make the equipment loan was fulfilled by the loan of May 11, 1989. Under the parol evidence rules summarized above, the obligations of the parties for those loans are controlled by the written instruments executed in connection with those loans, and the previous conversations, letters, etc., cannot be used to vary their terms.

### (c) Pattern and Custom

The plaintiffs pled that an agreement was established by the bank's pattern and custom and the plaintiffs' expectations in reliance on said pattern and custom. The court instructed the jury upon that notion. We are unable to find the phrase "pattern and custom" in the Uniform Commercial Code; however, the term "custom" appears in Neb. U.C.C. § 1–102(2) (Reissue 1980). This section states in significant part: "(2) Underlying purposes and policies of this act are . . . (b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties . . . ." In the index of the Nebraska Uniform Commercial Code, the word "custom," listed as "custom and usage," references code sections covering course of dealing and usage of trade. See Neb. U.C.C. § 1–205 (Reissue 1992). The word "pattern" does not appear in the Uniform Commercial Code.

In their brief, the plaintiffs make the following argument:

> [T]he Bank refuses to recognize the existence of a pattern and custom of dealing between the parties, of which the jury was instructed without objection, and which existed from the time the relationship started in 1988. That pattern and custom specifically involved the existence of a loan agreement that included notes for the floor planning of used vehicles and the purchase of equipment with that obligation amortized over seven years, agreements to loan funds for the purchase of parts and building improvements, the agreement to provide financial statements, specific agreements on curtailments and other similar arrangements.

Brief for appellees at 21.

We do not believe Nebraska law envisions a contract composed of a mishmash of oral agreements, practice and custom of the parties, and written agreements.

"A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question." § 1–205(2). Clearly the facts that the plaintiffs rely upon to establish pattern and custom are not encompassed within this definition. The events relied upon by plaintiffs as quoted in their brief cannot be "course of dealing" because that term applies to "a sequence of previous conduct between the parties to a particular transaction," § 1–205(1), and the events stated in the plaintiffs' brief relate to things that happened after the demand note was signed.

> The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade.

§ 1–205(4). The matters relied upon by plaintiffs as a pattern and custom could perhaps be included in the term "course of performance"; however, that term is defined in the code only in reference to sales. See Neb. U.C.C. § 2–208 (Reissue 1992).

The $125,000 note and the security documents executed at the same time are completely integrated documents insofar as the floor plan financing is concerned. The replacement note was likewise an integrated document, and its provisions were not ambiguous. The same is true with regard to the later executed $40,000 note. Neither of these documents can be varied by pattern and custom of the parties, course of dealing, usage of trade, or course of performance.

### (d) Subsequent Agreements

The trial court's jury instructions refer to the plaintiffs' claim that Solar Motors was not in default under the terms of the March 5, 1990, letter. Plaintiffs do not plead the letter of March 5 as a contract or a novation, or that it changed the terms

of a contract that existed at the time it was written. The letter by its terms merely states that if certain changes were not made the bank would not continue the line of credit; it cannot be interpreted to mean that if the changes are accomplished, the loan will become payable only upon a good faith demand. Furthermore, it could not be a modification of the existing contract because it was not pled as such, and "[a] modification of a contract which substantially changes the liability of the parties ordinarily requires mutual assent to be effective." *Grand Island Prod. Credit Assn. v. Humphrey*, 223 Neb. 135, 138–39, 388 N.W.2d 807, 810 (1986). There is no evidence of mutual assent.

We conclude that there was no enforceable agreement that would change the effect of the demand provision in the $125,000 note or the default provision of the $40,000 note and that both notes were due by their terms, and the bank's right to demand payment was not limited by any requirement of good faith.

## VI. PLAINTIFFS' CROSS–APPEAL

In their cross–appeal, Solar Motors and Baker allege the district court erred in refusing to instruct the jury regarding breach of contract and in instructing the jury on a subjective instead of an objective standard for the duty of good faith and fair dealing.

The plaintiffs' position regarding an instruction on the breach of contract theory can best be explained by a quote from their brief. In their brief, the plaintiffs refer to loan agreements between the bank and Baker entered into in October 1988 and in the following months of 1988 and 1989, which the plaintiffs state were later reduced to writing through letters and promissory notes. The brief then states the following:

> Baker maintains that the Bank breached these agreements by terminating the credit relationship at a time when the obligations owed by Baker to the bank were current; by failing to follow the initial agreement that contemplated a business relationship for more than one year; by failing to loan funds for the purchase of parts as agreed; by failing to loan funds for the making of building improvements as

agreed, and; by failing to abide by its agreement to loan funds for the purchase of equipment, which note was amortized over a period of seven years and was called by Bank at a time when Baker was current in the payments on the note.

Brief for appellees on cross–appeal at 39.

As the above quote demonstrates, the cross–appeal merely presents the same claim under a breach of contact theory as was presented under the good faith and fair dealing theory, and it is rejected for the reason that the parol evidence rule prevents one from establishing a cause of action for contract upon a hodgepodge of negotiations and preliminary agreements.

The plaintiffs never developed a clear agreement with regard to any commitment the bank might have made to loan Solar Motors or Baker $40,000 to purchase parts. We are therefore unable to consider the possibility that the bank might have breached such a commitment. We therefore conclude the trial court should be affirmed on its refusal to submit the case to the jury on the plaintiffs' theory of breach of contract.

## VII. CONCLUSION

We conclude that the trial court should not have submitted the case to the jury on the basis of alleged bad faith on the part of the bank. The trial court is directed to set aside the judgment of $204,357 and dismiss the case.

REVERSED AND REMANDED.