PRODUCTION CREDIT ASSOCIATION OF THE MIDLANDS, A
CORPORATION, APPELLEE, V. ELDIN HAUSSERMANN FARMS, INC.,
A NEBRASKA CORPORATION, ET AL., APPELLANTS.
529 N.W.2d 26

Filed March 10, 1995.   No. S-93-492.

Robert B. Creager, of Berry, Anderson, Creager &
Wittstruck, P.C., for appellants.

Tim W. Thompson, of Kelley, Scritsmier & Byrne, P.C., for appellee.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, and CONNOLLY, JJ.

CONNOLLY, J.

Production Credit Association (PCA) brought this action against Eldin Haussermann Farms, Inc. (Farms), Wilma Haussermann, and Dale Haussermann to foreclose on real estate mortgages granted to it by Farms. Farms defended against the foreclosure claiming that the mortgages were unenforceable under several theories of law. Farms and Dale also counterclaimed, seeking damages for breach of contract. The trial court dismissed the counterclaims after Farms had presented its case in chief. After all the evidence was submitted, the trial court ruled in favor of PCA and granted the motion for foreclosure. Farms appealed. For the reasons stated below, we affirm.

## FACTUAL BACKGROUND

Eldin Haussermann and his wife, Wilma (the Haussermanns), owned 51 percent of the stock of Farms; the remaining stock was held by their children. Farms was created in 1980 as a real estate holding corporation. The Haussermanns conducted an agricultural business on Farms' land, which included the raising of crops and a cattle feeding operation. Over the course of more than 30 years, PCA granted to the Haussermanns annual operating loans secured by crops and livestock. In 1982 and in the years following, the Haussermanns' operating loans were budget loans. Budget loans differ from line of credit loans in that the lender, in its discretion, has the ability to review the borrower's operation, to allocate loaned funds for specific uses, and to determine whether requested additional loans should be made.

By December 1984, the amount that the Haussermanns owed on the operating loans exceeded $1 million. PCA spoke with Eldin Haussermann, then president of Farms, about selling real estate or collateralizing the loan to cover some of the balance. That same month, Eldin was killed in a farm accident. After

Eldin's death, Wilma and Dale, the Haussermanns' eldest son and the succeeding president of Farms, operated Farms and negotiated with PCA. An interim operating loan was granted to Wilma for operations until Eldin's estate was settled. After submission of cash flow projections, a new operating loan was granted to Wilma for the 1985 operating year. The 1985 operating loan budgeted for the production of crops, pasture rental, family expenses, and similar expenditures, but did not budget for additional cattle purchases. The interim loan and ensuing operating loan were granted pursuant to PCA's understanding that the loans would be secured by Farms' real estate. Wilma purchased livestock in December 1984 with the funds from the interim loan. Wilma did not budget for additional livestock purchases during the operating year, and PCA did not schedule a portion of the operating loan for the purchase of additional livestock. PCA had noted on the Haussermanns' 1984 operating loan application that, in the future, the Haussermanns planned on buying "less feeder cattle."

Wilma and Farms agreed to restructuring of the operating debt, and mortgages were granted on the real estate. The transaction was structured such that Farms agreed to mortgage its property in return for a term note executed by Farms, Wilma, and Dale. The funds procured through the term note were, in turn, loaned by Farms to Wilma so that she could satisfy the existing operating debt. The stated purpose of the loan restructuring was to grant PCA security so that it could grant an operating loan to Wilma for 1985 and continue to grant operating loans to her if the business showed a profit during the 1985 operating year. Farms was aware of PCA's projection that Wilma would lose money during 1985.

In August 1985, Wilma requested an additional operating loan which PCA granted. That same month, Wilma and Dale spoke with PCA and requested an additional loan for the purchase of livestock. PCA did not grant the livestock loan.

In November 1985, 2 weeks prior to the operating loan payment date, PCA determined that Wilma would lose in excess of $150,000 during the 1985 operating year. PCA refused to grant an operating loan for the 1986 year. The payment on

Farms' note was late, and Wilma's operating loan was paid following the sale of capital assets. Efforts to further restructure the debt were unsuccessful, and Farms' default was accelerated. PCA filed a petition for foreclosure on the real estate mortgage.

Farms, Wilma, and Dale filed affirmative defenses to the petition, claiming that PCA was barred from foreclosing under the theories of failure of consideration, fraud in the inducement of the contract, and equitable estoppel. Farms also counterclaimed for profits lost from the forced premature sale of cattle and from the failure to loan money to buy new cattle. Dale also filed a counterclaim. The trial court dismissed the counterclaims at the completion of Farms' case. The trial court directed a verdict in favor of PCA after all the evidence was submitted. Farms has appealed.

## ASSIGNMENTS OF ERROR

Farms assigns as error the district court's granting of PCA's petition for foreclosure, finding that Farms' affirmative defenses were unsupported, and dismissing Farms' counterclaim.

## STANDARD OF REVIEW

"A proceeding to foreclose a real estate mortgage is an equitable action. [Citations omitted.] When an equity case is appealed from the district court, the appellate court tries factual issues de novo on the record and reaches a conclusion independent of the findings of the trial court. When the evidence conflicts, however, the appellate court may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another. . . ."

*DeMoor v. DeMoor*, 246 Neb. 765, 767, 523 N.W.2d 361, 363 (1994), quoting *McCook Nat. Bank v. Myers*, 243 Neb. 853, 503 N.W.2d 200 (1993).

Farms' counterclaim alleged that PCA had breached its contract. A suit for damages arising from breach of a contract presents an action at law. *Lange Indus. v. Hallam Grain Co.*, 244 Neb. 465, 507 N.W.2d 465 (1993). In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be set aside on appeal unless clearly erroneous. *Id.* Therefore, an appellate court must review PCA's

foreclosure suit de novo and Farms' counterclaim under the "clearly erroneous" standard.

## ANALYSIS

Although Wilma and Dale appear as appellants, the brief filed on behalf of the appellants focuses on the errors assigned by Farms. We limit our analysis to Farms' assignments of error. Farms asserts that PCA should not be allowed to foreclose on the property because (1) the contract is void for failure of consideration caused by PCA's failure to deal in good faith, (2) the contract is voidable by Farms because of PCA's fraud in inducing Farms to grant the mortgages, and (3) the contract is void due to PCA's breach of contract.

### FAILURE OF CONSIDERATION AND GOOD FAITH

Matters which seek to avoid a valid contract are affirmative defenses. The burden of proving an affirmative defense rests upon the defendant. Failure of consideration is an affirmative defense. *Spittler v. Nicola*, 239 Neb. 972, 479 N.W.2d 803 (1992). There is sufficient consideration for a promise if there is any benefit to the promisor or any detriment to the promisee. The benefit need not be to the party contracting, but may be to anyone else at the contracting party's procurement or request. *Id.*

Accompanying every contract is a common–law duty to perform with care, skill, reasonable expediency, and faithfulness the thing agreed to be done. *Schuster v. Baumfalk*, 229 Neb. 785, 429 N.W.2d 339 (1988). The statutory obligation of good faith in the performance or enforcement of a contract can exist in a debtor–creditor relationship. See, *Bloomfield v. Nebraska State Bank*, 237 Neb. 89, 465 N.W.2d 144 (1991); Neb. U.C.C. § 1–203 (Reissue 1992).

Farms points to the refusal of PCA to issue the livestock loan as a failure to deal in good faith. Farms states that Wilma's inability to procure livestock contributed to her failure to generate a profit and, subsequently, to the acceleration of Farms' note. Farms claims that it detrimentally relied on PCA's promise to lend to Wilma as it had in the past and that PCA should not be allowed to profit from its failure to keep its promise.

Farms also claims that PCA breached its duty of good faith by unreasonably refusing to issue an operating loan for 1986. Farms suggests that, by reviewing the status of the operation in November when the loan was due in December and by failing to use generally accepted accounting principles, PCA did not deal in good faith with Wilma and Farms.

As authority for its position that PCA should be barred from foreclosing on the mortgages, Farms cites, among other cases, the Nebraska Supreme Court's decision in *Yankton Prod. Credit Assn. v. Larsen*, 219 Neb. 610, 365 N.W.2d 430 (1985). In *Yankton Prod. Credit Assn.*, a borrower appealed a summary judgment in favor of a lender that had refused to disburse projected budget loan allotments. The borrower claimed that a question existed whether the lender had promised to loan sufficient funds to finance the expansion of a farming operation. The borrower also claimed that a question existed whether the lender had breached its duty of good faith. On appeal, the Supreme Court found that the lender created a line of credit in favor of the borrower in the sum of $737,000. The lender later refused to advance a large portion of the sum. The contract between the parties stated that the lender could refuse to advance the funds at its discretion, but the court found that, in practice, PCA was obligated to disburse projected funds if the borrower met certain requirements. The Supreme Court held that questions existed regarding the lender's breach of a promise to lend funds and regarding the possibility of the lender breaching the duty of good faith to the detriment of the borrower.

Farms reliance on *Yankton Prod. Credit Assn.* is misplaced. In *Yankton Prod. Credit Assn.*, the lender refused to disburse budgeted loans. In the present case, PCA loaned the entire amount requested by Wilma. Farms does not allege that PCA failed to disburse budgeted amounts, but, rather, states that PCA, acting beyond the scope of good faith, varied from its course of dealing with Wilma as it had in the past when it refused to loan her money for the purchase of livestock.

Farms' argument fails to properly consider the previous dealings between the parties. Previous budget loan applications submitted by the Haussermanns were entered into evidence.

Each of the applications included a budget for livestock purchases. The only livestock loan money requested by Wilma for 1985 concerned cattle that were purchased early in the operating year. PCA made money available for that purchase. Furthermore, PCA had noted that the Haussermanns had planned on purchasing less livestock after 1984. On our de novo review, we find that the refusal to loan additional money did not violate any reasonable expectation of any of the parties to the contract and did not constitute a breach of good faith. We further find that Farms received the consideration for which it bargained in the restructuring of the operating debt.

### FRAUDULENT REPRESENTATION

In order to sustain the affirmative defense of false representation, a defendant must prove by a preponderance of the evidence that a representation was made; that the representation was false; that the representation was known to be false when made, or was made recklessly without knowledge of its truth and as a positive assertion; that it was made with the intention that the defendant should rely on it; that the defendant did so rely; and that the defendant suffered damages as a result. *Gibb v. Citicorp Mortgage, Inc.*, 246 Neb. 355, 518 N.W.2d 910 (1994); *Lambelet v. Novak*, 225 Neb. 229, 404 N.W.2d 28 (1987).

Farms claims that, in return for the mortgages, PCA represented that Wilma or Farms was to receive a continuing operating loan "as it had for over 30 years." Farms argues that PCA misrepresented its position regarding the status of the operating loans and Farms detrimentally relied on that misrepresentation. Farms claims that, by refusing to issue an additional loan for livestock, PCA did not grant loans to Wilma as promised. Farms claims that PCA knew it would not issue loans as it had in the past and intended that Farms would rely on its misrepresentation.

Farms notes that had PCA called its note due prior to restructuring, PCA would only have been able to recover against 51 percent of Farms real estate—the 51 percent held by the Haussermanns as stockholders of Farms. Farms reasons that as a corporation it would have benefited from the restructuring

only if the farming operation were allowed to continue.

Farms admits, however, that at the time it granted the mortgages, it knew that PCA would only grant an operating loan for 1986 if Wilma was able to generate a profit in farming operations in 1985. Farms also admits that PCA issued to Wilma all the funds required under the loan agreements.

In *O'Neill Prod. Credit Assn. v. Mellor*, 220 Neb. 555, 371 N.W.2d 265 (1985), a debtor defended against a foreclosure proceeding by claiming that the mortgagee was equitably estopped from foreclosure because it had made false representations in obtaining the mortgage. The debtor failed to state specifically what false representations had been made. The court upheld the trial court award of summary judgment in favor of the mortgagee. The court stated, "The fact that matters did not develop as one or all of the parties might have expected or hoped does not prove that [the mortgagee] misrepresented anything." *Id.* at 559, 371 N.W.2d at 267.

From our de novo review, we find no evidence of a misrepresentation on the part of PCA. PCA apprised Farms of the risks of assuming the Haussermanns' debt, and Farms willingly accepted those risks.

### BREACH OF CONTRACT

In order to recover in an action for breach of contract, the plaintiff must plead and prove the existence of a promise, its breach, damage, and compliance with any conditions precedent that activate the defendant's duty. *Gibb, supra.*

The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other. *Bloomfield v. Nebraska State Bank*, 237 Neb. 89, 465 N.W.2d 144 (1991).

Farms claims that PCA breached its contract by improperly reviewing the profitability of Wilma's 1985 operation and by refusing to issue an operating loan based on that review. In support of this argument, Farms points to the testimony of a PCA official stating that he could not specify the manner in which the operation had lost money. PCA countered this argument at trial by establishing that PCA and the Haussermanns historically determined the profitability of the

operation by comparing the changing total worth of the operation from year to year. PCA claimed that the method in which the parties historically determined profitability prevented PCA from determining the exact source of corporate loss. PCA also established that the 1985 operating loan was paid with funds collected from the sale of capital rather than with operating profits and that the capital sale contributed to the loss of total worth.

From our de novo review, we find that the November accounting was sufficient to determine an operating loss over the course of the operating year. Farms offers no evidence that Wilma generated a profit during 1985. Furthermore, Farms did not contest the amount of the operating loss at trial, but only the manner in which the loss was determined. However, PCA established that the manner in which it determined profitability was the accepted business practice between the parties. PCA also established that Wilma failed to generate a profit in 1985 according to the accepted accounting procedure. The evidence presented by PCA was sufficient to prove that it was justified in rejecting a request for an operating loan for 1986 in accord with the 1985 agreement. We find that PCA did not breach its agreement with Wilma.

We conclude from our de novo review that each of the affirmative defenses raised by Farms is without merit. Because of these findings, and specifically the finding that PCA did not breach its contract, we also find that the counterclaim filed by Farms is meritless.

AFFIRMED.