IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

LOOMIS V. MESSERSMITH

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

DANIEL R. LOOMIS AND JACQUELINE L. LOOMIS, HUSBAND AND WIFE, APPELLEES,

v.

MICHAEL E. MESSERSMITH AND PEGGY S. MESSERSMITH, HUSBAND AND WIFE, APPELLANTS.

Filed June 23, 2015.    No. A-14-559.

Appeal from the District Court for Hayes County: DAVID URBOM, Judge. Affirmed.

James R. Korth and Trevor Perkins, of Reynolds, Korth & Samuelson, P.C., L.L.O., for appellants.

Brock D. Wurl, of Norman, Paloucek & Herman Law Offices, for appellees.

MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

BISHOP, Judge.

Michael Messersmith and Peggy Messersmith appeal from the order of summary judgment entered by the Hayes County District Court ejecting them from certain real property that they previously owned but deeded to Daniel Loomis and Jacqueline Loomis in 2008 via a written real estate sale agreement and warranty deed. The Messersmiths claim that ejection was improper as they had an ownership interest in the real property because they had an oral agreement with the Loomises to "buyback" the real property for a period of time following the 2008 transaction. The Messersmiths therefore sought enforcement of the oral buyback agreement, or in the alternative, sought to "disaffirm" the written real estate contract and determine it was void due to fraud because, at the time they executed the real estate sale agreement, the Loomises represented to the Messersmiths that they would have the option to buy back their real property. We affirm.

- 1 -

BACKGROUND

Michael and his wife Peggy owned a parcel of farmland ("the property") in Hayes County, where they had lived for 21 years. In the spring of 2008, Michael and Peggy began talking with American Mortgage Bank about selling the property due to their financial troubles. Sometime in June 2008, Peggy and Michael began talking to Monty Sever as a potential investor to purchase the property, and Sever referred them to another investor, Regan Scow. According to Peggy, Scow proposed he would purchase the property for $650,000, and provided that the Messersmiths would have an option to buy the property back in 4 to 5 years. Scow's proposal required the Messersmiths to make annual payments and pay an investor fee "at the end[.]" Peggy testified that she and Michael were "very close" to entering into this agreement.

Before entering into the agreement with Scow, Michael testified that he called Daniel in early fall of 2008 to see if he could help him out with purchasing their property. (Peggy testified she thought they started talking to the Loomises about a potential sale at the end of July 2008). The Messersmiths and Loomises had known each other for about 30 to 40 years, as they "grew up" together in Hayes County. Michael and Daniel went to high school together; Daniel considered Michael an acquaintance but did not see much of Michael after high school.

Michael testified that when he called Daniel in the fall of 2008, he told Daniel that he and Peggy were having financial trouble, and asked if Daniel was interested in buying the property. According to Michael, Daniel said he was interested and would think about it. Michael testified that Daniel said "he didn't want to lose anybody out of Hayes County" and agreed to help the Messersmiths out.

According to Michael, over the next several weeks, he had a few conversations with Daniel about a potential sale of the property and they arrived at a purchase price of $535,000. Michael testified they arrived at $535,000 because that was what he and Peggy owed to the various banks to which they were indebted. Peggy testified this price included the amount to "pay off American Mortgage, FSA," "stuff on a credit card," and insurance. Peggy testified the purchase price of $535,000 "was pretty well mutual" and was what they "came up with" after talking to their banker. Daniel testified that the Messersmiths came up with the $535,000 price, which he generally thought was the fair market value of the property; he did not do any "dickering" with respect to the purchase price.

According to Michael, prior to selling the property to the Loomises, the only term of the agreement that they discussed was the purchase price of the land. Michael could not recall if there were any other terms that he understood to be a part of the agreement to sell the property to the Loomises. Michael thought he had asked Daniel at some point in their initial conversations about buying back the property, and according to Michael, Daniel said "fine because he wanted to help." When Michael was asked what the terms of this buyback were, Michael replied, "Well, there really wasn't . . . There wasn't no terms or nothing then," and replied affirmatively that "It was more of a, hey, I'd entertain the offer to let you buy it back[;]" the agreement was that Daniel would "at least entertain discussions about selling it back[.]" Michael later testified that part of the reason why he agreed to the $535,000 purchase price was because he also had an agreement from the

Loomises that they were going to sell the property back after 5 years at the same price plus the cost of improvements.

Peggy testified that prior to selling their land, she had discussed with Daniel "him paying off our bills and going along the line as the investors but not having all the added expenses. Just that in [4] to [5] years, that we would have the option to buy it all back at the price that he gave plus any improvements that he had did." Peggy testified that she understood the deal with the Loomises to be "basically almost along the same line [as the agreement with Scow] except there wouldn't be the annual payments" or the investor fee. Peggy testified that "The deals were basically the same. I didn't have the added expense with the Loomises. I could buy it back for less money from the Loomises than I could from [Scow]. So, I went with the Loomises."

Both Peggy and Michael testified that the agreement to buy back the property was not in writing.

Daniel testified that he remembered some discussions regarding a buyback option prior to purchasing the property. Daniel testified that Michael had asked for an option to buy back at least part of the property, and Daniel's attorney prepared a proposed "Option to Purchase" written agreement for the Messersmiths to repurchase a portion of the real property (the portion containing the residence north of an existing county road). This written option proposed that

> [O]n or before October 6, 2009[,] [the Messersmiths] shall have the option to purchase the Real Estate from [the Loomises] for a purchase price of $245,000 plus (1) the cost of any improvements made by [the Loomises] to the Real Estate prior to October 6, 2009, (2) all real estate taxes paid by [the Loomises] attributable to the Real Estate and improvements thereon and (3) all insurance premiums paid by [the Loomises] attributable to the Real Estate and the improvements thereon.

The proposed Option to Purchase provided that after October 6, 2009, and lasting for a period of 3 years thereafter, the Messersmiths "shall continue having an option to purchase the Real Estate for the prices set forth below." The prices and dates were: $294,000 plus improvements, real estate taxes, and insurance premiums on or before October 6, 2010; $352,800 plus improvements, real estate taxes, and insurance premiums on or before October 6, 2011; and $423,360 plus improvements, real estate taxes, and insurance premiums on or before October 6, 2012. After October 6, 2012, the repurchase option "shall terminate in all respects." Daniel testified that his proposed repurchase agreement sat "on my living room table for five weeks. And five times, I said [to Michael] take it home and read it. It was never responded upon." Michael testified, however, that the first time he remembered seeing this document was in 2012.

On September 10, 2008, the Messersmiths and the Loomises entered into a written "Real Estate Sale Agreement." Pursuant to this agreement, the Messersmiths agreed to sell the property to the Loomises for $535,000. This agreement contained no provision regarding a buyback/repurchase option. The sale agreement stated that the Loomises had retained counsel, and the Messersmiths "acknowledge that they have, or have had an opportunity to, retain an attorney of their own choice and that they are not obtaining legal advice from [the Loomises' attorney]." The Agreement further stated that

This Agreement represents the entire Agreement of the parties with respect to the subject matter hereof and all prior agreements are revoked and superseded by this Agreement. No representations, warranties, inducements or oral agreements have been made by any of the parties except as expressly set forth herein or in other contemporaneous written agreements. This Agreement may not be changed, modified, or rescinded except in writing, signed by all parties hereto and any attempt of oral modification of the agreement shall be void and of no effect.

On October 3, 2008, the Messersmiths deeded the property to the Loomises via a warranty deed.

After the Messersmiths sold the property to the Loomises, Michael began working for Daniel on the property doing general farm labor. In exchange, the Loomises permitted the Messersmiths to remain in the residence on the property.

After the sale in October 2008, Michael testified he did not have further conversations with Daniel about buying the property back until around 2011 or 2012. Michael testified that when those conversations first started, "There wasn't no purchase agreement" but there was an agreement between him and Daniel "That [Michael] could start trying to look for the money to buy it back." Michael testified he and Peggy first sought a loan for $1.727 million from McCook National Bank "[B]ecause that's what Danny said that we needed" to purchase the entire property; the Messersmiths were denied that loan. Michael testified that they later sought a loan from Valley Bank in the amount of $325,000 to finance the purchase of the portion of the property north of the county road (the part containing the residence). Michael testified that was the amount Daniel wanted for it. That loan was also denied. Michael testified he and Peggy then went to Kevin Fornoff, an individual, seeking a loan of $345,000 because "that's what Danny raised that price up to." According to Michael, Fornoff gave them $345,000, but when Michael informed Daniel that they "got the money," Daniel "upped it again" and would only sell the entire property for about $2 million. Michael testified they gave back the $345,000 to Fornoff. Michael then asked to borrow money from another individual, Mackay Brown, but Brown "just said no, he couldn't do it." Michael also asked his dad, Deloit Messersmith, for a $325,000 loan, and he agreed he would give Michael and Peggy the money; however, because Daniel would not take it, Deloit never extended the loan.

Peggy also testified about her and Michael's attempts to buy the property back from the Loomises. Peggy testified that sometime in March 2012, she and Michael decided they needed to start working on buying back the property, so Michael approached Daniel to discuss it. Peggy testified that in late May or early June 2012, she spoke to a representative at Valley Bank about obtaining $325,000 in financing to purchase the portion of the property north of the county road. According to Peggy, the representative denied the loan and told them "that it would not work with just the feedlot as collateral because of the cattle prices. We needed both sides to make the place pay for itself." Peggy testified she explained to Daniel that the bank said purchasing the property north of the county road "wouldn't work," and he said he would "think it over for a couple of weeks" and come back with an answer. Peggy said "he came back with the $1.725 [million]" price for the entire property. Peggy testified she and Michael then went to McCook National Bank for a

loan for the entire property, but were denied because they could not "come up with $300,000 for a downpayment." Peggy testified that later in October 2012 they talked to Daniel again about buying just the property north of the county road, and Daniel said if they came up with $325,000, they could have it. Peggy testified they went to Michael's dad, Deloit, and asked for $325,000, but then Daniel said "no sale." Peggy said Daniel then asked for $345,000; she and Michael talked to Fornoff in late November or December 2012 and he agreed to loan them $345,000, but Daniel refused it and said they could buy the entire property for $2 million. Peggy testified her mom said she would help them get the money, but then the Loomises "upped the price and then they lowered the price." The Messersmiths talked to the representative at McCook National Bank again who said there was "no way he would have went over the two million. It was too close to the value of the land." The Loomises never sold the property back to the Messersmiths.

Daniel terminated Michael's employment in December 2012. On December 28, counsel for the Loomises sent the Messersmiths a letter confirming that Daniel gave them notice to vacate on December 13, and stated that the Messersmiths had 30 days from that notice to vacate, no later than January 13, 2013. The Messersmiths acknowledged they received this letter via certified mail on December 29, 2012. Michael acknowledged that his employment terminated December 31, and that he and Peggy remained in the residence on the property as of the time of his deposition in January 9, 2014, without paying rent.

The Loomises filed a complaint for restitution and ejection on June 5, 2013, against the Messersmiths. The Loomises alleged that the Messersmiths had resided as tenants in a dwelling on the Loomises' property since October 3, 2008, but that the Messersmiths had not paid rent since at least January 1, 2013. The Loomises alleged they provided notice to the Messersmiths on December 13, 2012, of their intent to terminate the month-to-month tenancy effective January 13, 2013, and that at the time of the petition, the Messersmiths unlawfully remained in possession of the property.

The Messersmiths filed an answer and counterclaim on July 12, 2013. They admitted receiving notice to vacate, but raised the affirmative defenses of waiver, estoppel, laches, accord and satisfaction, settlement or setoff, unclean hands, and fraud. The Messersmiths also asserted a counterclaim for fraud in the inducement, fraudulent misrepresentation, breach of contract, and unjust enrichment. The basis for each of the Messersmiths' counterclaims was their assertion that Daniel induced them to sell their property to him because of his promise to sell the property back to them within 5 years at the same price, plus the cost of improvements. The relief sought by the Messersmiths in their counterclaim was an order "Compelling the [Loomises] to complete the agreement between the parties by transferring the Real Property to the [Messersmiths] at a price equivalent to the 2008 sale price ($535,000.00) plus the cost of any improvements made by the [Loomises] after October 3, 2008," consequential damages, pre- and post-judgment interest, attorney fees, and other relief as just and equitable. The Loomises raised the affirmative defense of the statute of frauds in their answer to the counterclaim.

On February 14, 2014, the Loomises filed a motion for summary judgment. On March 19, the Loomises filed a motion to transfer the case to the District Court for Hayes County, and the county court entered an order on March 20 granting the motion.

A hearing on the Loomises' motion for summary judgment was held April 16, 2014. At the hearing, counsel for the Messersmiths informed the court that although their counterclaim sought enforcement of an oral contract, because the Messersmiths contend there was fraud in the inducement, the most appropriate remedy would be to disaffirm the 2008 real estate contract and determine it was void. The court received deposition and affidavit testimony from Daniel, Michael, and Peggy. The court also received affidavits from Sever, Scow, and Marlene Bedore (a "Real Property Tax Liaison for the State of Nebraska"). The Loomises objected to certain statements in the affidavits of Sever, Scow, and Bedore, on the basis of relevancy and hearsay, regarding those individuals' understanding of the existence of a buyback agreement between the Messersmiths and Loomises; the court reserved ruling on those objections.

On May 19, 2014, the district court entered an order granting the Loomises' motion for summary judgment. The court sustained the Loomises' objections to the statements in Scow, Sever, and Bedore's affidavits (discussed further in our Analysis below).

The court found that the alleged oral buyback agreement between the Messersmiths and the Loomises violated the statute of frauds and thus any alleged contract for the repurchase of the real property was void and unenforceable. With respect to the Messersmiths' fraud in the inducement/misrepresentation claims, the district court concluded that the testimony reflected that no written repurchase agreement existed and the testimony indicated Daniel told Michael he would "entertain an offer to let [him] buy it back." The court also found the facts did not support a claim for unjust enrichment because the Messersmiths acknowledged that they sold the farm to the Loomises willingly at the price agreed to by both parties.

The court found that the Loomises owned the property, the Messersmiths' right to occupy the residence on the property terminated with the termination of Michael's employment, the Loomises gave notice to the Messersmiths to vacate, and the Messersmiths failed to vacate; the court thus granted the Loomises' motion for summary judgment.

The Messersmiths timely appealed.

## ASSIGNMENTS OF ERROR

The Messersmiths assign nine errors on appeal, which we summarize and consolidate as follows: the district court erred (1) in excluding certain statements of Sever, Scow, and Bedore regarding their understanding of the existence of an oral buyback agreement between the Loomises and Messersmiths, (2) in finding that the Loomises did not acquire title to the real property through fraud, misrepresentation, or an abuse of relationship, (3) in finding that the statute of frauds applied, and (4) in granting summary judgment in favor of the Loomises.

## STANDARD OF REVIEW

An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law. *Johnson v. Nelson*, 290 Neb. 703, 861 N.W.2d 705 (2015). In reviewing a summary judgment, the court views the evidence in the light most favorable to the party against whom the judgment was granted and gives such party the benefit of all reasonable

inferences deducible from the evidence. *DMK Biodiesel, LLC v. McCoy*, 290 Neb. 286, 859 N.W.2d 867 (2015).

ANALYSIS

The Messersmiths generally advanced two theories of recovery at the trial level, both of which were predicated on their allegations of fraud and would have resulted in them regaining title to the property they deeded to the Loomises in 2008. First, the Messersmiths sought rescission of the 2008 written Real Estate Sale Agreement conveying the property to the Loomises on the basis of fraud, misrepresentation, or abuse of relationship. Alternatively, the Messersmiths sought to enforce an alleged oral agreement between them and the Loomises permitting them to repurchase the property, arguing the statute of frauds did not apply due to the Loomises' fraud. Because the Messersmiths contend they were entitled to title of the property at issue, they argue that granting summary judgment in favor of the Loomises on their action for ejection was improper.

*Evidentiary Exclusions.*

The Messersmiths first argue that the district court erred in excluding admissible evidence. At the summary judgment hearing, the district court sustained hearsay and relevancy objections to certain testimony in affidavits from Sever, Scow, and Bedore (a "Real Property Tax Liaison for the State of Nebraska"), which the Messersmiths argue on appeal was error.

Bedore's excluded testimony was her statement that she was advised by the county assessor (Sue Messersmith) that Sue had learned from the Messersmiths that the sale between them and the Loomises involved the Messersmiths "being granted the right to buy back the real estate after a specified period of time." Similarly, Sever and Scow's excluded testimony was that they learned from the Messersmiths that they would be doing the "same deal" with "the neighbors" that they were on the verge of doing with Sever and Scow, including an option to buy back the property.

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Neb. Rev. Stat. § 27-801(3) (Reissue 2008). The Messersmiths argue that the above excluded statements were "not offered to prove the truth of the matter asserted, but to show the effect on the hearer and should have been properly considered as evidence of a contemporaneous agreement between the parties." Brief for appellants at 15. A statement offered to prove its impact on the listener, instead of its truth, is offered for a valid nonhearsay purpose if the listener's knowledge, belief, response, or state of mind after hearing the statement is relevant to an issue in the case. *State v. McCave*, 282 Neb. 500, 805 N.W.2d 290 (2011). The knowledge, belief, or state of mind of Sever, Scow, and Bedore is irrelevant to any issue in the instant case; the only purpose of their testimony is to prove that the Messersmiths and Loomises had a buyback agreement, i.e., to prove the truth of the matter asserted. Further, substantially similar evidence was admitted at the summary judgment hearing; Sue Messersmith's affidavit testimony was admitted, wherein she testified that she heard from Peggy that the sale between the Loomises and Messersmiths involved a right to buy back the property. Even if the district court's exclusion was error, an erroneous exclusion of evidence is reversible only if the complaining litigant was prejudiced by the exclusion of such evidence, and an improper exclusion of evidence is ordinarily not prejudicial where substantially similar

evidence is admitted without objection. See *Sturzenegger v. Father Flanagan's Boy's Home*, 276 Neb. 327, 754 N.W.2d 406 (2008). We therefore find no error in the district court's exclusion of Sever, Scow, and Bedore's testimony.

*Fraud in Inducement/Fraudulent Misrepresentation.*

The Messersmiths' primary contention is that the 2008 real estate agreement should be voided based upon fraudulent inducement and fraudulent misrepresentation committed by the Loomises, and that there are sufficient facts in controversy to defeat entry of summary judgment against them on these claims. The Messersmiths contend that the Loomises fraudulently induced them into entering into the 2008 Real Estate Sale Agreement. Fraud in the inducement goes to the means used to induce a party to enter into a contract; in such cases, the party knows the character of the instrument and intends to execute it, but the contract may be voidable if the party's consent was obtained by false representations. See *Heritage Bank v. Bruha*, 283 Neb. 263, 812 N.W.2d 260 (2012). A contract is voidable by a party if his or her manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which he or she is justified in relying. *InterCall, Inc. v. Egenera, Inc.*, 284 Neb. 801, 824 N.W.2d 12 (2012). The Messersmiths, therefore, sought to void or rescind the 2008 Real Estate Sale Agreement conveying title to the property to the Loomises, and "have their land returned to them and disgorge the $535,000.00 they received in payment[.]" Brief for appellants at 17.

In order to sustain the affirmative defense of false representation, a defendant must prove by a preponderance of the evidence that a representation was made; that the representation was false; that the representation was known to be false when made, or was made recklessly without knowledge of its truth and as a positive assertion; that it was made with the intention that the defendant should rely on it; that the defendant did so rely; and that the defendant suffered damages as a result. *Prod. Credit Ass'n of Midlands v. Eldin Haussermann Farms, Inc.*, 247 Neb. 538, 529 N.W.2d 26 (1995). A misrepresentation induces a party's manifestation of assent if it substantially contributes to the party's decision to manifest his or her assent. *InterCall, supra*.

As evidence of the Loomises' fraud, the Messersmiths point to the unequal bargaining power between themselves and the Loomises (as this was the Messersmiths' first land transaction whereas the Loomises owned several pieces of land), their own financial troubles, the unexecuted agreement they had reached with Scow, and the sale price of the property (which the Messersmiths claim was below fair market value). However, the evidence was undisputed that prior to any involvement with the Loomises, the Messersmiths had already decided to sell the property due to their financial distress. Further, the Messersmiths approached Daniel, not vice versa, to see if he would be interested in purchasing their property. The Messersmiths were seeking an alternative agreement to the one they had reached with Scow. And, although the Messersmiths attempt to impart significance to the purchase price being below fair market value, their own testimony reflected that they were the ones who "came up with" the purchase price of $535,000, and that the purchase price was "mutual."

More importantly, noticeably absent from the Messersmiths' above claimed evidence of fraud were any affirmative actions or statements on the Loomises' part constituting a false representation made with the intent that the Messersmiths would rely on it. The only evidence

offered with respect to any statements made by the Loomises to the Messersmiths were the Messersmiths' affidavit testimony that "Daniel . . . told [us] that he would 'take care of everything,' and then he and his lawyer drew up some papers and we did nothing else except [sign] the papers they told us we needed to sign" and that "We believed Daniel . . . when he told us he was providing us a better deal and would take care of all the details." Such statements, however, are not false representations or misrepresentations of fact. The evidence offered reflects that the parties had discussed a repurchase or buyback option of the property during negotiations prior to the execution of the 2008 real estate agreement. The evidence further reflects that Daniel in fact had his attorney prepare a written "Option to Purchase" agreement for the Messersmiths to repurchase a portion of the real property (the portion containing the residence north of an existing county road). However, this agreement remained unsigned. According to Michael himself, no definitive buyback agreement was ever reached. Michael testified that the only terms of the agreement that they discussed prior to selling the property was the purchase price of the land; when Michael was asked what the terms of the oral buyback agreement were at that point, he replied, "Well, there really wasn't . . . There wasn't no terms or nothing then," and replied affirmatively that "It was more of a, hey, I'd entertain the offer to let you buy it back[;]" the agreement was that Daniel would "at least entertain discussions about selling it back[.]" Peggy testified that prior to selling their land, they had "discussed" with Daniel "him paying off our bills and going along the line as the investors but not having all the added expenses." The written real estate agreement unambiguously stated:

> This Agreement represents the entire Agreement of the parties with respect to the subject matter hereof and all prior agreements are revoked and superseded by this Agreement. *No representations, warranties, inducements or oral agreements have been made by any of the parties except as expressly set forth herein* or in other contemporaneous written agreements. This Agreement may not be changed, modified, or rescinded except in writing, signed by all parties hereto and any attempt of oral modification of the agreement shall be void and of no effect.

(Emphasis added). The written real estate agreement contained no option to repurchase/buyback the property, and the Messersmiths do not allege they did not understand the written agreement or raise concerns with the fact that the written agreement did not contain a buyback provision. The fact that the Messersmiths thought or believed they would be able to repurchase the property after selling it to the Loomises, despite the parties' unambiguous written agreement, does not give rise to an inference of fraud or misrepresentation on behalf of the Loomises. "The fact that matters did not develop as one or all of the parties might have expected or hoped does not prove that [anyone] misrepresented anything." *Prod. Credit Ass'n of Midlands v. Eldin Haussermann Farms, Inc.*, 247 Neb. 538, 545, 529 N.W.2d 26, 32 (1995). Even viewing the evidence in the light most favorable to the Messersmiths, we conclude the evidence was insufficient to create a genuine issue of material fact with respect to the Messersmiths' affirmative defenses of fraudulent inducement and fraudulent misrepresentation.

*Statute of Frauds*.

The Messersmiths argue that the district court erred in finding that the alleged oral buyback agreement between them and the Loomises violated the statute of frauds. "Every contract . . . for the sale of any lands, shall be void unless the contract or some note or memorandum thereof be in writing and signed by the party whom the . . . sale is to be made." Neb. Rev. Stat. § 36-105 (Reissue 2008). An oral contract to buy land falls under the statute of frauds. *American Cent. City, Inc. v. Joint Antelope Valley Auth.*, 281 Neb. 742, 807 N.W.2d 170 (2011). The alleged agreement between the Loomises and the Messersmiths was for the sale of land and was not in writing, and thus it falls squarely within the statute of frauds. Nevertheless, the Messersmiths urge that equity should not permit the Loomises to "perpetrate a fraud upon the Messersmiths" and then "hide behind a statute designed to prevent . . . fraud." Brief for appellants at 25. In support of their argument, the Messersmiths cite to *Hecht v. Marsh*, 105 Neb. 502, 502, 181 N.W. 135, 137 (1920), which stated the rule that:

> Equity will not allow the statute of frauds to be used as an instrument of fraud, and will decree specific performance or hold the maker of a parol contract estopped from denying it when the other party, by virtue of it, and under and in pursuance of it, has so far acted as that it would be aiding in a fraud to permit the contract to be repudiated. And what equity would do our courts of law, under proper allegations, will also do.

*Hecht v. Marsh, supra*, involved a sale and exchange of lands; the seller refused to sign a contract unless the buyer put up forfeit money as evidence of good faith. To induce the seller to waive this requirement, the broker orally agreed to waive his commission if the transaction was not completed. When the contract was not performed, the broker sued for his commission. In concluding that the oral contract was not precluded by the statute of frauds, the court stated that equity will not allow the statute of frauds to be used as an instrument of fraud, and where a party to a written contract within the statute of frauds induces another to waive some provision upon which he is entitled to insist and thereby change his position to his disadvantage because of that party's inducement, the inducing party will be estopped to claim that such oral modification is invalid because not in writing. See *id.* However, the court in *Farmland Serv. Coop, Inc. v. Klein*, 196 Neb. 538, 543, 244 N.W.2d 86, 90 (1976) limited this rule, stating that:

> [T]he mere breach or violation of an oral agreement which is specifically covered by the statute of frauds by one of the parties thereto or the mere denial of an agreement or refusal to perform it is not of itself a fraud either in equity or in law for which the court should give relief. The mere pleading of reliance on the contract to his detriment should not be sufficient to permit a party to assert rights and defenses based on a contract barred by the statute of frauds. If he were permitted to do so, the statute of frauds would be rendered meaningless and nugatory. The mere failure to perform an oral contract within the statute where no relation of trust and confidence exists does not constitute fraud authorizing the right to relief.

As discussed above, although the Messersmiths repeatedly allege that the Loomises, and in particular Daniel, engaged in fraud, they offered no evidence from which fraud could be inferred. It appears the Messersmiths' allegations of fraud simply were that they thought or believed that they would be able to repurchase the property at a later date, but "the mere breach or violation of an oral agreement which is specifically covered by the statute of frauds by one of the parties thereto or the mere denial of an agreement or refusal to perform it is not of itself a fraud either in equity or in law for which the court should give relief." *Id*. We therefore agree with the district court that any alleged oral repurchase agreement between the parties was barred by the statute of frauds.

*Summary Judgment on Loomises' Ejection Action*.

The Messersmiths' defense to the Loomises' action for ejection was that they were in lawful possession of the property as title owners. The essential elements of the action of ejectment are legal estate, a right of possession in the plaintiff, and unlawful detention by the defendant. *Johnston v. Robertson*, 171 Neb. 324, 106 N.W.2d 192 (1960). Having concluded the district court properly determined that the Messersmiths were not entitled to title of the property, the evidence is undisputed that the Loomises were the owners of the property; the Messersmiths acknowledged they received written notice to vacate the property; the Messersmiths remained in possession of the property for nearly a year after being given notice to vacate; and that they have not paid any rent to the Loomises since January 1, 2013. Therefore, the district court properly granted summary judgment in favor of the Loomises.

## CONCLUSION

For the foregoing reasons, we affirm the district court's order of summary judgment in favor of the Loomises.

AFFIRMED.